(Slip Opinion)          OCTOBER TERM, 2009          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JERMAN *v.* CARLISLE, McNELLIE, RINI, KRAMER & ULRICH LPA ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 08–1200.  Argued January 13, 2010—Decided April 21, 2010

The Fair Debt Collection Practices Act (FDCPA), 15 U. S. C. §1692 *et
seq.,* imposes civil liability on "debt collector[s]" for certain prohibited
debt collection practices.  A debt collector who "fails to comply with
any [FDCPA] provision . . . with respect to any person is liable to
such person" for "actual damage[s]," costs, "a reasonable attorney's
fee as determined by the court," and statutory "additional damages."
§1692k(a).  In addition, violations of the FDCPA are deemed unfair or
deceptive acts or practices under the Federal Trade Commission Act
(FTC Act), §41 *et seq*., which is enforced by the Federal Trade Com-
mission (FTC).  See §1692*l*.  A debt collector who acts with "actual
knowledge or knowledge fairly implied on the basis of objective cir-
cumstances that such act is [prohibited under the FDCPA]" is subject
to civil penalties enforced by the FTC.  §§45(m)(1)(A), (C).  A debt col-
lector is not liable in any action brought under the FDCPA, however,
if it "shows by a preponderance of evidence that the violation was not
intentional and resulted from a bona fide error notwithstanding the
maintenance of procedures reasonably adapted to avoid any such er-
ror."  §1692k(c).

   Respondents, a law firm and one of its attorneys (collectively Car-
lisle), filed a lawsuit in Ohio state court on behalf of a mortgage com-
pany to foreclose a mortgage on real property owned by petitioner
Jerman.  The complaint included a notice that the mortgage debt
would be assumed valid unless Jerman disputed it in writing.  Jer-
man's lawyer sent a letter disputing the debt, and, when the mort-
gage company acknowledged that the debt had in fact been paid, Car-
lisle withdrew the suit.  Jerman then filed this action, contending
that by sending the notice requiring her to dispute the debt in writ-

ing, Carlisle had violated §1692g(a) of the FDCPA, which governs the
contents of notices to debtors.  The District Court, acknowledging a
division of authority on the question, held that Carlisle had violated
§1692g(a) but ultimately granted Carlisle summary judgment under
§1692k(c)'s "bona fide error" defense.  The Sixth Circuit affirmed,
holding that the defense in §1692k(c) is not limited to clerical or fac-
tual errors, but extends to mistakes of law.

*Held:* The bona fide error defense in §1692k(c) does not apply to a viola-
tion resulting from a debt collector's mistaken interpretation of the
legal requirements of the FDCPA.  Pp. 6–30.

   (a) A violation resulting from a debt collector's misinterpretation of
the legal requirements of the FDCPA cannot be "not intentional" un-
der §1692k(c).  It is a common maxim that "ignorance of the law will
not excuse any person, either civilly or criminally." *Barlow* v. *United
States*, 7 Pet. 404, 411.  When Congress has intended to provide a
mistake-of-law defense to civil liability, it has often done so more ex-
plicitly than here.  In particular, the administrative-penalty provi-
sions of the FTC Act, which are expressly incorporated into the
FDCPA, apply only when a debt collector acts with "actual knowledge
or knowledge fairly implied on the basis of objective circumstances"
that the FDCPA prohibited its action.  §§45(m)(1)(A), (C).  Given the
absence of similar language in §1692k(c), it is fair to infer that Con-
gress permitted injured consumers to recover damages for "inten-
tional" conduct, including violations resulting from a mistaken inter-
pretation of the FDCPA, while reserving the more onerous
administrative penalties for debt collectors whose intentional actions
reflected knowledge that the conduct was prohibited.  Congress also
did not confine FDCPA liability to "willful" violations, a term more of-
ten understood in the civil context to exclude mistakes of law.  See,
*e.g., Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 125–126.
Section 1692k(c)'s requirement that a debt collector maintain "proce-
dures reasonably adapted to avoid any such error" also more natu-
rally evokes procedures to avoid mistakes like clerical or factual er-
rors.  Pp. 6–12.

   (b) Additional support for this reading is found in the statute's con-
text and history.  The FDCPA's separate protection from liability for
"any act done or omitted in good faith in conformity with any [FTC]
advisory opinion,"  §1692k(e), is more obviously tailored to the con-
cern at issue (excusing civil liability when the FDCPA's prohibitions
are uncertain) than the bona fide error defense.  Moreover, in enact-
ing the FDCPA in 1977, Congress copied the pertinent portions of the
bona fide error defense from the Truth in Lending Act (TILA),
§1640(c).  At that time, the three Federal Courts of Appeals to have
considered the question interpreted the TILA provision as referring

to clerical errors, and there is no reason to suppose Congress disagreed with those interpretations when it incorporated TILA's language into the FDCPA. Although in 1980 Congress amended the defense in TILA, but not in the FDCPA, to exclude errors of legal judgment, it is not obvious that amendment changed the scope of the TILA defense in a way material here, given the prior uniform judicial interpretation of that provision. It is also unclear why Congress would have intended the FDCPA's defense to be broader than TILA's, and Congress has not expressly *included* mistakes of law in any of the parallel bona fide error defenses elsewhere in the U. S. Code. Carlisle's reading is not supported by *Heintz* v. *Jenkins*, 514 U. S. 291, 292, which had no occasion to address the overall scope of the FDCPA bona fide error defense, and which did not depend on the premise that a misinterpretation of the requirements of the FDCPA would fall under that provision. Pp. 13–22.

(c) Today's decision does not place unmanageable burdens on debt-collecting lawyers. The FDCPA contains several provisions expressly guarding against abusive lawsuits, and gives courts discretion in calculating additional damages and attorney's fees. Lawyers have recourse to the bona fide error defense in §1692k(c) when a violation results from a qualifying factual error. To the extent the FDCPA imposes some constraints on a lawyer's advocacy on behalf of a client, it is not unique; lawyers have a duty, for instance, to comply with the law and standards of professional conduct. Numerous state consumer protection and debt collection statutes contain bona fide error defenses that are either silent as to, or expressly exclude, legal errors. To the extent lawyers face liability for mistaken interpretations of the FDCPA, Carlisle and its *amici* have not shown that "the result [will be] so absurd as to warrant" disregarding the weight of textual authority. *Heintz, supra*, at 295. Absent such a showing, arguments that the FDCPA strikes an undesirable balance in assigning the risks of legal misinterpretation are properly addressed to Congress. Pp. 22–30.

538 F. 3d 469, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, THOMAS, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion. SCALIA, J., filed an opinion concurring in part and concurring in the judgment. KENNEDY, J., filed a dissenting opinion, in which ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1200

KAREN L. JERMAN, PETITIONER *v.* CARLISLE, MC-
NELLIE, RINI, KRAMER & ULRICH LPA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[April 21, 2010]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

The Fair Debt Collection Practices Act (FDCPA or Act) imposes civil liability on "debt collector[s]" for certain prohibited debt collection practices. Section 813(c) of the Act, 15 U. S. C. §1692k(c), provides that a debt collector is not liable in an action brought under the Act if she can show "the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." This case presents the question whether the "bona fide error" defense in §1692k(c) applies to a violation resulting from a debt collector's mistaken interpretation of the legal requirements of the FDCPA. We conclude it does not.

I

A

Congress enacted the FDCPA in 1977, 91 Stat. 874, to eliminate abusive debt collection practices, to ensure that debt collectors who abstain from such practices are not competitively disadvantaged, and to promote consistent state action to protect consumers. 15 U. S. C. §1692(e). The Act regulates interactions between consumer debtors

and "debt collector[s]," defined to include any person who "regularly collects . . . debts owed or due or asserted to be owed or due another." §§1692a(5), (6). Among other things, the Act prohibits debt collectors from making false representations as to a debt's character, amount, or legal status, §1692e(2)(A); communicating with consumers at an "unusual time or place" likely to be inconvenient to the consumer, §1692c(a)(1); or using obscene or profane language or violence or the threat thereof, §§1692d(1), (2). See generally §§1692b–1692j; *Heintz* v. *Jenkins*, 514 U. S. 291, 292–293 (1995).

The Act is enforced through administrative action and private lawsuits. With some exceptions not relevant here, violations of the FDCPA are deemed to be unfair or deceptive acts or practices under the Federal Trade Commission Act (FTC Act), 15 U. S. C. §41 *et seq.*, and are enforced by the Federal Trade Commission (FTC). See §1692*l*. As a result, a debt collector who acts with "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is [prohibited under the FDCPA]" is subject to civil penalties of up to $16,000 per day. §§45(m)(1)(A), (C); 74 Fed. Reg. 858 (2009) (amending 16 CFR §1.98(d)).

The FDCPA also provides that "any debt collector who fails to comply with any provision of th[e] [Act] with respect to any person is liable to such person." 15 U. S. C. §1692k(a). Successful plaintiffs are entitled to "actual damage[s]," plus costs and "a reasonable attorney's fee as determined by the court." *Ibid.* A court may also award "additional damages," subject to a statutory cap of $1,000 for individual actions, or, for class actions, "the lesser of $500,000 or 1 per centum of the net worth of the debt collector." §1692k(a)(2). In awarding additional damages, the court must consider "the frequency and persistence of [the debt collector's] noncompliance," "the nature of such noncompliance," and "the extent to which such noncompli-

ance was intentional." §1692k(b).

The Act contains two exceptions to provisions imposing liability on debt collectors. Section 1692k(c), at issue here, provides that

> "[a] debt collector may not be held liable in any action brought under [the FDCPA] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

The Act also states that none of its provisions imposing liability shall apply to "any act done or omitted in good faith in conformity with any advisory opinion of the [Federal Trade] Commission." §1692k(e).

## B

Respondents in this case are a law firm, Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A., and one of its attorneys, Adrienne S. Foster (collectively Carlisle). In April 2006, Carlisle filed a complaint in Ohio state court on behalf of a client, Countrywide Home Loans, Inc. Carlisle sought foreclosure of a mortgage held by Countrywide in real property owned by petitioner Karen L. Jerman. The complaint included a "Notice," later served on Jerman, stating that the mortgage debt would be assumed to be valid unless Jerman disputed it in writing. Jerman's lawyer sent a letter disputing the debt, and Carlisle sought verification from Countrywide. When Countrywide acknowledged that Jerman had, in fact, already paid the debt in full, Carlisle withdrew the foreclosure lawsuit.

Jerman then filed her own lawsuit seeking class certification and damages under the FDCPA, contending that Carlisle violated §1692g by stating that her debt would be

assumed valid unless she disputed it in writing.[1]   While acknowledging a division of authority on the question, the District Court held that Carlisle had violated §1692g by requiring Jerman to dispute the debt in writing.   464 F. Supp. 2d 720, 722–725 (ND Ohio 2006).[2]   The court ultimately granted summary judgment to Carlisle, however, concluding that §1692k(c) shielded it from liability because the violation was not intentional, resulted from a bona fide error, and occurred despite the maintenance of procedures reasonably adapted to avoid any such error. 502 F. Supp. 2d 686, 695–697 (ND Ohio 2007).  The Court of Appeals for the Sixth Circuit affirmed.  538 F. 3d 469 (2008).   Acknowledging that the Courts of Appeals are divided regarding the scope of the bona fide error defense, and that the "majority view is that the defense is available for clerical and factual errors only," the Sixth Circuit nonetheless held that §1692k(c) extends to "mistakes of law."  *Id.,* at 473–476 (internal quotation marks omitted). The Court of Appeals found "nothing unusual" about attorney debt collectors maintaining "procedures" within the meaning of §1692k(c) to avoid mistakes of law.  *Id.,* at 476.  Noting that a parallel bona fide error defense in the

——————

[1] Section 1692g(a)(3) requires a debt collector, within five days of an "initial communication" about the collection of a debt, to send the consumer a written notice containing, *inter alia*, "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector."

[2] The District Court distinguished, for instance, *Graziano* v. *Harrison*, 950 F. 2d 107, 112 (CA3 1991), which held a consumer's dispute of a debt under §1692g must be in writing to be effective.   Noting that district courts within the Sixth Circuit had reached different results, and distinguishing one unpublished Sixth Circuit decision which Carlisle suggested approved a form with an in-writing requirement, the court adopted the reasoning from *Camacho* v. *Bridgeport Financial, Inc.*, 430 F. 3d 1078, 1080–1082 (CA9 2005), and held that the plain language of §1692g does not impose an "in writing" requirement on consumers.  See 464 F. Supp. 2d, at 725.

Truth in Lending Act (TILA), 15 U. S. C. §1640(c), expressly excludes legal errors, the court observed that Congress has amended the FDCPA several times since 1977 without excluding mistakes of law from §1692k(c). 538 F. 3d, at 476.[3]

We granted certiorari to resolve the conflict of authority as to the scope of the FDCPA's bona fide error defense,[4] 557 U. S. \_\_\_ (2009), and now reverse the judgment of the Sixth Circuit.

—————

[3] Because the question was not raised on appeal, the Court of Appeals did not address whether Carlisle's inclusion of the "in writing" requirement violated §1692g. 538 F. 3d, at 472, n. 2. We likewise express no view about whether inclusion of an "in writing" requirement in a notice to a consumer violates §1692g, as that question was not presented in the petition for certiorari. Compare *Graziano*, *supra*, at 112 (reading §1692g(a)(3) to require that "any dispute, to be effective, must be in writing"), with *Camacho*, *supra*, at 1082 (under §1692g(a)(3), "disputes need not be made in writing").

[4] Compare, *e.g.*, 538 F. 3d, at 476 (case below), with *Baker* v. *G. C. Servs. Corp.*, 677 F. 2d 775, 779 (CA9 1982), and *Hulshizer* v. *Global Credit Servs., Inc.*, 728 F. 2d 1037, 1038 (CA8 1984) *(per curiam)*.

The Courts of Appeals have also expressed different views about whether 15 U. S. C. §1692k(c) applies to violations of the FDCPA resulting from a misinterpretation of the requirements of state law. Compare *Johnson* v. *Riddle*, 305 F. 3d 1107, 1121 (CA10 2002) (concluding that §1692k(c) applies where a debt collector's misinterpretation of a Utah dishonored check statute resulted in a violation of §1692f(1), which prohibits collection of any amount not "permitted by law"), with *Picht* v. *Jon R. Hawks, Ltd.*, 236 F. 3d 446, 451–452 (CA8 2001) (stating that §1692k(c) does not preclude FDCPA liability resulting from a creditor's mistaken legal interpretation of a Minnesota garnishment statute). The parties disagree about whether §1692k(c) applies when a violation results from a debt collector's misinterpretation of the legal requirements of state law or federal law other than the FDCPA. Compare Brief for Petitioner 47–49, with Brief for Respondents 60–62. Because this case involves only an alleged misinterpretation of the requirements of the FDCPA, we need not, and do not, reach those other questions.

## II
## A

The parties disagree about whether a "violation" resulting from a debt collector's misinterpretation of the legal requirements of the FDCPA can ever be "not intentional" under §1692k(c). Jerman contends that when a debt collector intentionally commits the act giving rise to the violation (here, sending a notice that included the "in writing" language), a misunderstanding about what the Act requires cannot render the violation "not intentional," given the general rule that mistake or ignorance of law is no defense. Carlisle and the dissent, in contrast, argue that nothing in the statutory text excludes legal errors from the category of "bona fide error[s]" covered by §1692k(c) and note that the Act refers not to an unintentional "act" but rather an unintentional "violation." The latter term, they contend, evinces Congress' intent to impose liability only when a party knows its conduct is unlawful. Carlisle urges us, therefore, to read §1692k(c) to encompass "all types of error," including mistakes of law. Brief for Respondents 7.

We decline to adopt the expansive reading of §1692k(c) that Carlisle proposes. We have long recognized the "common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." *Barlow* v. *United States*, 7 Pet. 404, 411 (1833) (opinion for the Court by Story, J.); see also *Cheek* v. *United States*, 498 U. S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system").[5] Our law is therefore no stranger to the

---

[5] The dissent discounts the relevance of the principle here, on grounds that this case involves the scope of a statutory exception to liability, rather than a provision "delineat[ing] a category of prohibited conduct." *Post*, at 15 (opinion of KENNEDY, J.). That is a distinction without a

possibility that an act may be "intentional" for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law. In *Kolstad* v. *American Dental Assn.*, 527 U. S. 526 (1999), for instance, we addressed a provision of the Civil Rights Act of 1991 authorizing compensatory and punitive damages for "intentional

————————

difference, as our precedents have made clear for more than 175 years. *Barlow* involved a statute providing for forfeiture of any goods entered "by a false denomination" in the office of a customs collector "for the benefit of drawback or bounty upon the exportation"; the statute included, however, an exception under which "said forfeiture shall not be incurred, if it shall be made appear . . . that such false denomination . . . happened by mistake or accident, and not from any intention to defraud the revenue." 7 Pet., at 406; see also Act of Mar. 2, 1799, §84, 1 Stat. 694. The Court concluded that the shipment at issue, entered as "refined sugars," was mislabeled under the prevailing meaning of that term and thus was subject to forfeiture "unless the [petitioner] c[ould] bring himself within the exceptio[n]." 7 Pet., at 409–410. As there had been no "accident" or "mistake" of fact, the "only mistake, if there ha[d] been any, [wa]s a mistake of law." *Id.,* at 410–411. The Court observed that the shipper's conduct, even if "entirely compatible with good faith, [wa]s not wholly free from the suspicion of an intention to overreach . . . by passing off, as refined sugars, what he well knew were not admitted to be such." *Id.,* at 411. But the Court declined to resolve the case on the ground of the shipper's intent, instead invoking the "common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." *Ibid.* Notwithstanding the existence of a statutory exception—which did not expressly exclude legal errors from the category of "mistake[s]" made without "intention to defraud"—the Court saw "not the least reason to suppose that the legislature, in this enactment, had any intention to supersede the common principle." *Ibid.*

The dissent implies *Barlow* is too old to be relevant. *Post*, at 16. But at least in the context of *stare decisis*, this Court has suggested precedents tend to gain, not lose, respect with age. See *Montejo* v. *Louisiana*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 13). In any event, Justice Story's opinion for a unanimous Court in *Barlow* is hardly a relic. As recently as 1994 this Court cited it for the "venerable principle" that ignorance of the law generally is no defense. *Ratzlaf* v. *United States*, 510 U. S. 135, 149; see also *Cheek* v. *United States*, 498 U. S. 192, 199 (1991) (citing *Barlow* for a similar proposition).

discrimination," 42 U. S. C. §1981a, but limiting punitive damages to conduct undertaken "with malice or with reckless indifference to the federally protected rights of an aggrieved individual," §1981a(b)(1). We observed that in some circumstances "intentional discrimination" could occur without giving rise to punitive damages liability, such as where an employer is "unaware of the relevant federal prohibition" or acts with the "distinct belief that its discrimination is lawful." 527 U. S., at 536–537. See also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 110 (5th ed. 1984) ("[I]f one intentionally interferes with the interests of others, he is often subject to liability notwithstanding the invasion was made under an erroneous belief as to some . . . legal matter that would have justified the conduct"); Restatement (Second) of Torts §164, and Comment *e* (1963–1964) (intentional tort of trespass can be committed despite the actor's mistaken belief that she has a legal right to enter the property).[6]

Likely for this reason, when Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly than here. In particular, the FTC Act's administrative-penalty provisions—which, as noted above, Congress expressly incorporated into the FDCPA—apply only when a debt collector acts with "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that its action was "prohibited by

---

[6] Different considerations apply, of course, in interpreting criminal statutes. *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. 47, 57–58, n. 9 (2007). But even in that context, we have not consistently required knowledge that the offending conduct is unlawful. See, *e.g., Ellis* v. *United States*, 206 U. S. 246, 255, 257 (1907) (observing, in the context of a statute imposing liability for "intentiona[l] violat[ions]," that "[i]f a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent").

[the FDCPA]." 15 U. S. C. §§45(m)(1)(A), (C). Given the absence of similar language in §1692k(c), it is a fair inference that Congress chose to permit injured consumers to recover actual damages, costs, fees, and modest statutory damages for "intentional" conduct, including violations resulting from mistaken interpretation of the FDCPA, while reserving the more onerous penalties of the FTC Act for debt collectors whose intentional actions also reflected "knowledge fairly implied on the basis of objective circumstances" that the conduct was prohibited. Cf. 29 U. S. C. §260 (authorizing courts to reduce liquidated damages under the Portal-to-Portal Act of 1947 if an employer demonstrates that "the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938"); 17 U. S. C. §1203(c)(5)(A) (provision of Digital Millennium Copyright Act authorizing court to reduce damages where "the violator was not aware and had no reason to believe that its acts constituted a violation").

Congress also did not confine liability under the FDCPA to "willful" violations, a term more often understood in the civil context to excuse mistakes of law. See, *e.g., Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 125–126 (1985) (civil damages for "willful violations" of Age Discrimination in Employment Act of 1967 require a showing that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited" (internal quotation marks omitted)); cf. *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. 47, 57 (2007) (although "'willfully'" is a "'word of many meanings'" dependent on context, "we have generally taken it [when used as a statutory condition of civil liability] to cover not only knowing violations of a standard, but reckless ones as well" (quoting *Bryan* v. *United States*, 524 U. S. 184, 191 (1998)). For this reason, the dissent missteps in relying on *Thurston* and *McLaugh-*

*lin* v. *Richland Shoe Co.*, 486 U. S. 128, 133 (1988), as both cases involved the statutory phrase "willful violation." *Post*, at 3.

The dissent reaches a contrary conclusion based on the interaction of the words "violation" and "not intentional" in §1692k(c). *Post*, at 2–3. But even in the criminal context, cf. n. 6, *supra*, reference to a "knowing" or "intentional" "violation" or cognate terms has not necessarily implied a defense for legal errors. See *Bryan* v. *United States*, 524 U. S. 184, 192 (1998) ("'[T]he knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law'" (quoting *Boyce Motor Lines, Inc.* v. *United States*, 342 U. S. 337, 345 (1952) (Jackson, J., dissenting)); *United States* v. *International Minerals & Chemical Corp.*, 402 U. S. 558, 559, 563 (1971) (statute imposing criminal liability on those who "'knowingly violat[e]'" regulations governing transportation of corrosive chemicals does not require "proof of [the defendant's] knowledge of the law"); *Ellis* v. *United States*, 206 U. S. 246, 255, 257 (1907) (rejecting argument that criminal penalty applicable to those who "intentionally violate" a statute "requires knowledge of the law").

The dissent advances a novel interpretative rule under which the combination of a "*mens rea* requirement" and the word "'violation'" (as opposed to language specifying "the conduct giving rise to the violation") creates a mistake-of-law defense. *Post*, at 2–3. Such a rule would be remarkable in its breadth, applicable to the many scores of civil and criminal provisions throughout the U. S. Code that employ such a combination of terms. The dissent's theory draws no distinction between "knowing," "intentional," or "willful" and would abandon the care we have traditionally taken to construe such words in their particular statutory context. See, *e.g., Safeco, supra*, at 57. More fundamentally, the dissent's categorical rule is at

odds with precedents such as *Bryan*, *supra*, at 192, and *International Minerals*, *supra*, at 559, 563, in which we rejected a mistake-of-law defense when a statute imposed liability for a "knowing violation" or on those who "knowingly violat[e]" the law.[7]

The dissent posits that the word "intentional," in the civil context, requires a higher showing of *mens rea* than "willful" and thus that it should be easier to avoid liability for intentional, rather than willful, violations. *Post*, at 4. Even if the dissent is correct that the phrase "intentional violation," standing alone in a civil liability statute, might be read to excuse mistakes of law, the FDCPA juxtaposes the term "not intentional" "violation" in §1692k(c) with the more specific language of §45(m)(1)(A), which refers to

———————

[7] Indeed, in *International Minerals*, the Court faced, and evidently rejected, the distinction the dissent would draw today between the term "'violation'" and a reference to "the conduct giving rise to the violation." *Post*, at 3. As noted, in *International Minerals*, the Court rejected a mistake-of-law defense for a statute that applied to those who "knowingly violat[e]" certain regulations. 402 U. S., at 559, 563. In so doing, however, we expressly acknowledged the contrary view adopted by one lower court opinion that knowledge of the regulations was necessary. *Id.,* at 562 (citing *St. Johnsbury Trucking Co.* v. *United States*, 220 F. 2d 393, 397 (CA1 1955) (Magruder, C. J., concurring)). The dissenting opinion in *International Minerals* quoted extensively portions of the *St. Johnsbury* concurrence that reached its result by contrasting a statute making it an offense "'"knowingly" to sell adulterated milk'" with one that makes it an offense "'knowingly [to] violat[e] a regulation.'" 402 U. S., at 566 (Stewart, J., dissenting) (quoting *St. Johnsbury*, *supra*, at 398).

*Liparota* v. *United States*, 471 U. S. 419 (1985), is also inapposite. Cf. *post*, at 3 (KENNEDY, J., dissenting). Concluding that a mistake-of-law defense is available under a provision that specifies particular conduct undertaken while "'knowing'" that food stamp coupons had been "'used in any manner in violation of [law],'" 471 U. S., at 428, n. 12, says little about the meaning of a "not intentional" "violation" in 15 U. S. C. §1692k(c). Indeed, the statute in *Liparota* bears a closer resemblance to the administrative penalty provision in §45(m)(1)(A). See *supra*, at 8–9.

"actual knowledge or knowledge fairly implied on the basis of objective circumstances" that particular conduct was unlawful. The dissent's reading gives short shrift to that textual distinction.

We draw additional support for the conclusion that bona fide errors in §1692k(c) do not include mistaken interpretations of the FDCPA, from the requirement that a debt collector maintain "procedures reasonably adapted to avoid any such error." The dictionary defines "procedure" as "a series of steps followed in a regular orderly definite way." Webster's Third New International Dictionary 1807 (1976). In that light, the statutory phrase is more naturally read to apply to processes that have mechanical or other such "regular orderly" steps to avoid mistakes—for instance, the kind of internal controls a debt collector might adopt to ensure its employees do not communicate with consumers at the wrong time of day, §1692c(a)(1), or make false representations as to the amount of a debt, §1692e(2). The dissent, like the Court of Appeals, finds nothing unusual in attorney debt collectors maintaining procedures to avoid legal error. *Post*, at 18; 538 F. 3d, at 476. We do not dispute that some entities may maintain procedures to avoid legal errors. But legal reasoning is not a mechanical or strictly linear process. For this reason, we find force in the suggestion by the Government (as *amicus curiae* supporting Jerman) that the broad statutory requirement of procedures reasonably designed to avoid "any" bona fide error indicates that the relevant procedures are ones that help to avoid errors like clerical or factual mistakes. Such procedures are more likely to avoid error than those applicable to legal reasoning, particularly in the context of a comprehensive and complex federal statute such as the FDCPA that imposes open-ended prohibitions on, *inter alia,* "false, deceptive," §1692e, or "unfair" practices, §1692f. See Brief for United States as *Amicus Curiae* 16–18.

Even if the text of §1692k(c), read in isolation, leaves room for doubt, the context and history of the FDCPA provide further reinforcement for construing that provision not to shield violations resulting from misinterpretations of the requirements of the Act. See *Dada* v. *Mukasey*, 554 U. S. 1, \_\_ (2008) (slip op., at 13) ("In reading a statute we must not look merely to a particular clause, but consider in connection with it the whole statute" (internal quotation marks omitted)). As described above, Congress included in the FDCPA not only the bona fide error defense but also a separate protection from liability for "any act done or omitted in good faith in conformity with any advisory opinion of the [FTC]." §1692k(e). In our view, the Court of Appeals' reading is at odds with the role Congress evidently contemplated for the FTC in resolving ambiguities in the Act. Debt collectors would rarely need to consult the FTC if §1692k(c) were read to offer immunity for good-faith reliance on advice from private counsel. Indeed, debt collectors might have an affirmative incentive not to seek an advisory opinion to resolve ambiguity in the law, as receipt of such advice would prevent them from claiming good-faith immunity for violations and would potentially trigger civil penalties for knowing violations under the FTC Act.[8] More importantly, the existence of a separate provision that, by its plain terms, is more obviously tailored to the concern at issue (excusing civil liability when the Act's prohibitions are uncertain) weighs against stretching the language of the bona fide error

—————

[8] One of Carlisle's *amici* suggests the FTC safe harbor would provide a more categorical immunity than §1692k(c), obviating the need, *e.g.*, to maintain "procedures reasonably adapted to avoid any such error." Brief for National Association of Retail Collection Attorneys as *Amicus Curiae* 18–19 (NARCA Brief). Even if that is true, we need not conclude that the FTC safe harbor would be rendered entirely superfluous to reason that the existence of that provision counsels against extending the bona fide error defense to serve an overlapping function.

defense to accommodate Carlisle's expansive reading.[9]

Any remaining doubt about the proper interpretation of §1692k(c) is dispelled by evidence of the meaning attached to the language Congress copied into the FDCPA's bona fide error defense from a parallel provision in an existing statute. TILA, 82 Stat. 146, was the first of several statutes collectively known as the Consumer Credit Protection Act (CCPA) that now include the FDCPA. As enacted in 1968, §130(c) of TILA provided an affirmative defense that was in pertinent part identical to the provision Congress later enacted into the FDCPA: "A creditor may not be held liable in any action brought under [TILA] if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 82 Stat. 157 (codified at 15 U. S. C. §1640(c)).

During the 9-year period between the enactment of TILA and passage of the FDCPA, the three Federal Courts of Appeals to consider the question interpreted TILA's bona fide error defense as referring to clerical errors; no such court interpreted TILA to extend to violations resulting from a mistaken legal interpretation of that Act.[10] We

_____

[9] Carlisle raises concerns about whether, in light of contemporary administrative practice, the FTC safe harbor is a realistic way for debt collectors and their lawyers to seek guidance on the numerous time-sensitive legal issues that arise in litigation. These practical concerns, to which we return below, do not change our understanding of the statutory text itself or the likely intent of the enacting Congress.

[10] See *Ives* v. *W. T. Grant Co.*, 522 F. 2d 749, 757–758 (CA2 1975) (concluding that the bona fide error defense in §1640(c) was unavailable despite creditor's reliance, in selecting language for credit contract forms, on a pamphlet issued by the Federal Reserve Board); *Haynes* v. *Logan Furniture Mart, Inc.*, 503 F. 2d 1161, 1167 (CA7 1974) ("[Section] 1640(c) offers no shelter from liability for the defendant, whose error . . . was judgmental with respect to legal requirements of the Act and not clerical in nature"); *Palmer* v. *Wilson*, 502 F. 2d 860, 861 (CA9

have often observed that when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well." *Bragdon* v. *Abbott*, 524 U. S. 624, 645 (1998); see also *Rowe* v. *New Hampshire Motor Transp. Assn.*, 552 U. S. 364, 370 (2008). While the interpretations of three Federal Courts of Appeals may not have "settled" the meaning of TILA's bona fide error defense, there is no reason to suppose that

_____

1974) (similar).

  Carlisle contends the meaning of TILA's defense was unsettled at the time of the FDCPA's enactment, relying first on several District Court opinions extending the defense to good-faith legal errors. See, *e.g., Welmaker* v. *W. T. Grant Co.*, 365 F. Supp. 531, 544 (ND Ga. 1972). But even assuming Congress would have looked to district court, rather than court of appeals, opinions in discerning the meaning of the statutory language, applicable Circuit precedent had cast some doubt on those decisions by the time the FDCPA was enacted. See, *e.g., Turner* v. *Firestone Tire & Rubber Co.*, 537 F. 2d 1296, 1298 (CA5 1976) *(per curiam)* (referring to §1640(c) as the "so-called clerical error defense"). Carlisle also relies on the holding in *Thrift Funds of Baton Rouge, Inc.* v. *Jones*, 274 So. 2d 150 (La. 1973). But in that case, the Louisiana Supreme Court concluded only that a lender's mistaken interpretation of *state* usury law did not "amoun[t] to an intentional violation of [TILA's] disclosure requirements." *Id.,* at 161. The Louisiana court had no occasion to address the question analogous to the one we consider today: whether TILA's bona fide error defense extended to violations resulting from mistaken interpretation of TILA itself. See n. 4, *supra;* see also *Starks* v. *Orleans Motors, Inc.*, 372 F. Supp. 928, 931 (ED La.) (distinguishing *Thrift Funds* on this basis), aff'd, 500 F. 2d 1182 (CA5 1974). These precedents therefore do not convince us that Congress would have ascribed a different meaning to the statutory language it chose for the FDCPA. Compare *post*, at 2 (SCALIA, J.*,* concurring in part and concurring in judgment), with *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 384–386, and n. 21 (1983) (concluding that Congress had "ratified" the "well-established judicial interpretation" of a statute by leaving it intact during a comprehensive revision, notwithstanding "[t]wo early district court decisions," not subsequently followed, that had adopted a contrary view).

Congress disagreed with those interpretations when it enacted the FDCPA. Congress copied verbatim the pertinent portions of TILA's bona fide error defense into the FDCPA. Compare 15 U. S. C. §1640(c) (1976 ed.) with §813(c), 91 Stat. 881. This close textual correspondence supports an inference that Congress understood the statutory formula it chose for the FDCPA consistent with Federal Court of Appeals interpretations of TILA.[11]

Carlisle and the dissent urge reliance, consistent with the approach taken by the Court of Appeals, on a 1980 amendment to TILA that added the following sentence to that statute's bona fide error defense: "Examples of a bona fide error include, but are not limited to, clerical, calculation, computer malfunction and program[m]ing, and printing errors, except that an error of legal judgment with respect to a person's obligations under [TILA] is not a bona fide error." See Truth in Lending Simplification and Reform Act, §615, 94 Stat. 181. The absence of a corre-

---

[11] That only three Courts of Appeals had occasion to address the question by the time the FDCPA was enacted does not render such an inference unreasonable. Contra, *post*, at 1–2 (opinion of Sᴄᴀʟɪᴀ, J.). Whether or not we would take that view when such an inference serves as a court's sole interpretative guide, here our conclusion also relies on common principles of statutory interpretation, as well as the statute's text and structure. Moreover, the inference is supported by the fact that TILA and the FDCPA were enacted as complementary titles of the CCPA, a comprehensive consumer-protection statute. While not necessary to our conclusion, evidence from the legislative record demonstrates that some Members of Congress understood the relationship between the FDCPA and existing provisions of the CCPA. See, *e.g.,* 123 Cong. Rec. 10242 (1977) (remarks of Rep. Annunzio) (civil penalty provisions in House version of bill were "consistent with those in the [CCPA]"); Fair Debt Collection Practices Act: Hearings on S. 656 et al. before the Subcommittee on Consumer Affairs of the Senate Committee on Banking, Housing and Urban Affairs, 95th Cong., 1st Sess., 51, 707 (1977) (statement of Rep. Wylie) (describing "[c]ivil liability provisions" in the House bill as "the standard provisions that attach to all the titles of the [CCPA]").

sponding amendment to the FDCPA, Carlisle reasons, is evidence of Congress' intent to give a more expansive scope to the FDCPA defense. For several reasons, we decline to give the 1980 TILA amendment such interpretative weight. For one, it is not obvious that the amendment changed the scope of TILA's bona fide error defense in a way material to our analysis, given the uniform interpretations of three Courts of Appeals holding that the TILA defense does not extend to mistakes of law.[12] (Contrary to

_____

[12] Although again not necessary to our conclusion, evidence from the legislative record suggests some Members of Congress understood the amendment to "clarif[y]" the meaning of TILA's bona fide error defense "to make clear that it applies to mechanical and computer errors, provided they are not the result of erroneous legal judgments as to the act's requirements." S. Rep. No. 96–73, pp. 7–8 (1979); see also Lockhart, 153 A. L. R. Fed. 211–212, §2[a] (1999) (amendment "was intended merely to clarify what was then the prevailing view, that the bona fide error defense applies to clerical errors, not including errors of legal judgment") (relying on S. Rep. No. 96–368, p. 32 (1979)).

The concurring and dissenting opinions perceive an inconsistency between these references to clerical errors, as well as similar references in the pre-FDCPA precedents interpreting TILA, n. 10, *supra*, and reading the FDCPA's bona fide error defense to include factual mistakes. *Post*, at 2–4, and n. 2 (opinion of SCALIA, J.); *post*, at 20 (KENNEDY, J., dissenting). The quoted legislative history sources, however, while stating expressly that the TILA defense excludes *legal* errors, do not discuss a distinction between clerical and factual errors. Similarly, the cited cases interpreting TILA do not address a distinction between factual and clerical errors; rather, the courts were presented with claims that the defense applied to mistakes of law or other nonfactual errors that the courts found not to be bona fide. See *Ives*, 522 F. 2d, at 756–757; *Haynes*, 503 F. 2d, at 1166–1167; *Palmer*, 502 F. 2d, at 861. While factual mistakes might, in some circumstances, constitute bona fide errors and give rise to violations that are "not intentional" within the meaning of §1692k(c), we need not and do not decide today the precise distinction between clerical and factual errors, or what kinds of factual mistakes qualify under the FDCPA's bona fide error defense. Cf. generally R. Hobbs, National Consumer Law Center, Fair Debt Collection §7.2 (6th ed. 2008 and Supp. 2009) (surveying case law on scope of §1692k(c)).

the dissent's suggestion, *post*, at 21, this reading does not render the 1980 amendment surplusage. Congress may simply have intended to codify existing judicial interpretations to remove any potential for doubt in jurisdictions where courts had not yet addressed the issue.) It is also unclear why Congress would have intended the FDCPA's defense to be broader than the one in TILA, which presents at least as significant a set of concerns about imposing liability for uncertain legal obligations. See, *e.g., Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555, 566 (1980) (TILA is "'highly technical'"). Our reluctance to give controlling weight to the TILA amendment in construing the FDCPA is reinforced by the fact that Congress has not expressly *included* mistakes of law in any of the numerous bona fide error defenses, worded in pertinent part identically to §1692k(c), elsewhere in the U. S. Code. Compare, *e.g.,* 12 U. S. C. §4010(c)(2) (bona fide error defense in Expedited Funds Availability Act expressly excluding "an error of legal judgment with respect to [obligations under that Act]") with 15 U. S. C. §§1693m(c), 1693h(c) (bona fide error provisions in the Electronic Fund Transfer Act that are silent as to errors of legal judgment).[13] Although

———————

[13] The Government observes that several federal agencies have construed similar bona fide error defenses in statutes they administer to exclude errors of law. See Brief for United States as *Amicus Curiae* 28–30. The Secretary of Housing and Urban Development, for instance, has promulgated regulations specifying that the bona fide error defense in the Real Estate Settlement Procedures Act of 1974, 12 U. S. C. §2607(d)(3), does not apply to "[a]n error of legal judgment," 24 CFR §3500.15(b)(1)(ii) (2009). While administrative interpretations of other statutes do not control our reading of the FDCPA, we find it telling that no agency has adopted the view of the Court of Appeals. Of course, nothing in our opinion today addresses the validity of such regulations or the authority of agencies interpreting bona fide error provisions in other statutes to adopt a different reading. See *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 982–983 (2005).

Carlisle points out that Congress has amended the FDCPA on several occasions without expressly restricting the scope of §1692k(c), that does not suggest Congress viewed the statute as having the expansive reading Carlisle advances, particularly as not until recently had a Court of Appeals interpreted the bona fide error defense to include a violation of the FDCPA resulting from a mistake of law. See *Johnson* v. *Riddle*, 305 F. 3d 1107, 1121–1124, and nn. 14–15 (CA10 2002).

Carlisle's reliance on *Heintz*, 514 U. S. 291, is also unavailing. We held in that case that the FDCPA's definition of "debt collector" includes lawyers who regularly, through litigation, attempt to collect consumer debts. *Id.,* at 292. We addressed a concern raised by the petitioner (as here, a lawyer collecting a debt on behalf of a client) that our reading would automatically render liable "any litigating lawyer who brought, and then lost, a claim against a debtor," on the ground that §1692e(5) prohibits a debt collector from making any "'threat to take action that cannot legally be taken.'" *Id.,* at 295. We expressed skepticism that §1692e(5) itself demanded such a result. But even assuming the correctness of petitioner's reading of §1692e(5), we suggested that the availability of the bona fide error defense meant that the prospect of liability for litigating lawyers was not "so absurd" as to warrant implying a categorical exemption unsupported by the statutory text. *Ibid.* We had no occasion in *Heintz* to address the overall scope of the bona fide error defense. Our discussion of §1692e(5) did not depend on the premise that a misinterpretation of the requirements of the Act would fall under the bona fide error defense. In the mine-run lawsuit, a lawyer is at least as likely to be unsuccessful because of factual deficiencies as opposed to legal error. Lawyers can, of course, invoke §1692k(c) for violations resulting from qualifying factual errors.

Carlisle's remaining arguments do not change our view

of §1692k(c).  Carlisle perceives an inconsistency between our reading of the term "intentional" in that provision and the instruction in §1692k(b) that a court look to whether "noncompliance was intentional" in assessing statutory additional damages.  But assuming §1692k(b) encompasses errors of law, we see no conflict, only congruence, in reading the Act to permit a court to adjust statutory damages for a good-faith misinterpretation of law, even where a debt collector is not entitled to the categorical protection of the bona fide error defense.  Carlisle is also concerned that under our reading, §1692k(c) would be unavailable to a debt collector who violates a provision of the FDCPA applying to acts taken with particular intent because in such instances the relevant act would not be unintentional.  See, *e.g.,* §1692d(5) (prohibiting a debt collector from "[c]ausing a telephone to ring . . . continuously with intent to annoy, abuse, or harass").  Including mistakes as to the scope of such a prohibition, Carlisle urges, would ensure that §1692k(c) applied throughout the FDCPA.  We see no reason, however, why the bona fide error defense must cover every provision of the Act.

The parties and *amici* make arguments concerning the legislative history that we address for the sake of completeness.  Carlisle points to a sentence in a Senate Committee Report stating that "[a] debt collector has no liability . . . if he violates the act in any manner, including with regard to the act's coverage, when such violation is unintentional and occurred despite procedures designed to avoid such violations."  S. Rep. No. 95–382, p. 5 (1977); see also *post*, at 4–6 (opinion of SCALIA, J.) (discussing report).  But by its own terms, the quoted sentence does not unambiguously support Carlisle's reading.  Even if a bona fide mistake "with regard to the act's coverage" could be read in isolation to contemplate a mistake of law, that reading does not exclude mistakes of fact.  A mistake "with regard to the act's coverage" may derive wholly from a debt collec-

tor's factually mistaken belief, for example, that a particular debt arose out of a nonconsumer transaction and was therefore not "covered" by the Act. There is no reason to read this passing statement in the Senate Report as contemplating an exemption for legal error that is the product of an attorney's erroneous interpretation of the FDCPA—particularly when attorneys were excluded from the Act's definition of "debt collector" until 1986. 100 Stat. 768. Moreover, the reference to "any manner" of violation is expressly qualified by the requirements that the violation be "unintentional" and occur despite maintenance of appropriate procedures. In any event, we need not choose between these possible readings of the Senate Report, as the legislative record taken as a whole does not lend strong support to Carlisle's view.[14] We therefore decline to

_____

[14] For instance, an amendment was proposed and rejected during the Senate Banking Committee's consideration of the FDCPA that would have required proof that a debt collector's violation was "knowin[g]." Senator Riegle, one of the Act's primary sponsors, opposed the change, explaining that the bill reflected the view that "certain things ought not to happen, period. . . . [W]hether somebody does it knowingly, willfully, you know, with a good heart, bad heart, is really quite incidental." See Senate Committee on Banking, Housing and Urban Affairs, Markup Session: S. 1130—Debt Collection Legislation 60 (July 26, 1977) (hereinafter Markup); see also *ibid.* ("We have left a way for these disputes to be adj[u]dicated if they are brought, where somebody can say, I didn't know that, or my computer malfunctioned, something happened, I didn't intend for the effect to be as it was"). To similar effect, a House Report on an earlier version of the bill explained the need for new legislation governing use of the mails for debt collection on grounds that existing statutes "frequently require[d]" a showing of "specific intent[,] which is difficult to prove." H. R. Rep. No. 95–131, p. 3 (1977). Elsewhere, to be sure, the legislative record contains statements more supportive of Carlisle's interpretation. In particular, a concern was raised in the July 26 markup session that the TILA bona fide error defense had been interpreted "as only protecting against a mathematical error," and that the FDCPA defense should "go beyond" TILA to "allow the courts discretion to dismiss a violation where it was a technical error." Markup 20. In response, a staffer explained that the

give controlling weight to this isolated passage.

## B

Carlisle, its *amici*, and the dissent raise the additional concern that our reading will have unworkable practical consequences for debt collecting lawyers. See, *e.g.,* Brief for Respondents 40–41, 45–48; NARCA Brief 4–16; *post*, at 5–14. Carlisle claims the FDCPA's private enforcement provisions have fostered a "cottage industry" of professional plaintiffs who sue debt collectors for trivial violations of the Act. See Brief for Respondents 40–41. If debt collecting attorneys can be held personally liable for their reasonable misinterpretations of the requirements of the Act, Carlisle and its *amici* foresee a flood of lawsuits against creditors' lawyers by plaintiffs (and their attorneys) seeking damages and attorney's fees. The threat of such liability, in the dissent's view, creates an irreconcilable conflict between an attorney's personal financial interest and her ethical obligation of zealous advocacy on behalf of a client: An attorney uncertain about what the FDCPA requires must choose between, on the one hand, exposing herself to liability and, on the other, resolving the legal ambiguity against her client's interest or advising the client to settle—even where there is substantial legal authority for a position favoring the client. *Post*, at 10–14.[15]

_____

FDCPA defense would "apply to any violation of the act which was unintentional," and answered affirmatively when the Chairman asked: "So it's not simply a mathematical error but any bona fide error without intent?" *Id.,* at 21. Whatever the precise balance of these statements may be, we can conclude that this equivocal evidence from legislative history does not displace the clear textual and contextual authority discussed above.

[15]The dissent also cites several other consumer-protection statutes, such as TILA and the Fair Credit Reporting Act, 15 U. S. C. §1681 *et seq.*, which in its view create "incentives to file lawsuits even where no actual harm has occurred" and are illustrative of what the dissent

Opinion of the Court

We do not believe our holding today portends such grave consequences.  For one, the FDCPA contains several provisions that expressly guard against abusive lawsuits, thereby mitigating the financial risk to creditors' attorneys.  When an alleged violation is trivial, the "actual damage[s]" sustained, §1692k(a)(1), will likely be *de minimis* or even zero.  The Act sets a cap on "additional" damages, §1692k(a)(2), and vests courts with discretion to adjust such damages where a violation is based on a good-faith error, §1692k(b).  One *amicus* suggests that attorney's fees may shape financial incentives even where actual and statutory damages are modest.  NARCA Brief 11.  The statute does contemplate an award of costs and "a reasonable attorney's fee as determined by the court" in the case of "any successful action to enforce the foregoing liability."  §1692k(a)(3).  But courts have discretion in calculating reasonable attorney's fees under this statute,[16]

———————

perceives to be a "troubling dynamic of allowing certain actors in the system to spin even good-faith, technical violations of federal law into lucrative litigation."  *Post*, at 5–6.  The dissent's concern is primarily with Congress' policy choice, embodied in statutory text, to authorize private rights of action and recovery of attorney's fees, costs, and in some cases, both actual and statutory damages.  As noted, in one of the statutes the dissent cites, Congress explicitly barred reliance on a mistake-of-law defense notwithstanding the "highly technical" nature of the scheme.  See 15 U. S. C. §1640(c) (TILA); *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555, 566 (1980).  Similarly, the plain text of the FDCPA authorizes a private plaintiff to recover not only "actual damage[s]" for harm suffered but also "such additional damages as the court may allow," §1692k(a).

[16] The Courts of Appeals generally review a District Court's calculation of an attorney fee award under §1692k for abuse of discretion.  See, *e.g., Carroll* v. *Wolpoff & Abramson*, 53 F. 3d 626, 628–629 (CA4 1995); *Emanuel* v. *American Credit Exchange*, 870 F. 2d 805, 809 (CA2 1989).  Many District Courts apply a lodestar method, permitting downward adjustments in appropriate circumstances.  See, *e.g., Schlacher* v. *Law Offices of Phillip J. Rotche & Assoc., P. C.*, 574 F. 3d 852 (CA7 2009) (relying on *Hensley* v. *Eckerhart*, 461 U. S. 424 (1983)); *Ferland* v. *Conrad Credit Corp.*, 244 F. 3d 1145, 1148–1151, and n. 4 (CA9 2001)

and §1692k(a)(3) authorizes courts to award attorney's fees to the defendant if a plaintiff's suit "was brought in bad faith and for the purpose of harassment."

Lawyers also have recourse to the affirmative defense in §1692k(c). Not every uncertainty presented in litigation stems from interpretation of the requirements of the Act itself; lawyers may invoke the bona fide error defense, for instance, where a violation results from a qualifying factual error. Jerman and the Government suggest that lawyers can entirely avoid the risk of misinterpreting the Act by obtaining an advisory opinion from the FTC under §1692k(e). Carlisle fairly observes that the FTC has not frequently issued such opinions, and that the average processing time may present practical difficulties. Indeed, the Government informed us at oral argument that the FTC has issued only four opinions in the past decade (in response to seven requests), and the FTC's response time

————————

*(per curiam);* see generally Hobbs, Fair Debt Collection §6.8.6. In *Schlacher*, for instance, the court affirmed a downward adjustment for the "unnecessary use of multiple attorneys . . . in a straightforward, short-lived [FDCPA] case." 574 F. 3d, at 854–855. In *Carroll*, the court found no abuse of discretion in a District Court's award of a $500 attorney's fee, rather than the lodestar amount, where the lawsuit had recovered only $50 in damages for "at most a technical violation" of the FDCPA. 53 F. 3d, at 629–631.

Lower courts have taken different views about when, and whether, §1692k requires an award of attorney's fees. Compare *Tolentino* v. *Friedman*, 46 F. 3d 645 (CA7 1995) (award of fees to a successful plaintiff "mandatory"), and *Emanuel, supra,* at 808–809 (same, even where the plaintiff suffered no actual damages), with *Graziano*, 950 F. 2d, at 114, and n. 13 (attorney's fees may be denied for plaintiff's "bad faith conduct"), and *Johnson* v. *Eaton*, 80 F. 3d 148, 150–152 (CA5 1996) ("attorney's fees . . . are only available [under §1692k] where the plaintiff has succeeded in establishing that the defendant is liable for actual and/or additional damages"; this reading "will deter suits brought only as a means of generating attorney's fees"). We need not resolve these issues today to express doubt that our reading of §1692k(c) will impose unmanageable burdens on debt collecting lawyers.

has typically been three or four months. Tr. of Oral Arg. 27–28, 30. Without disregarding the possibility that the FTC advisory opinion process might be useful in some cases, evidence of present administrative practice makes us reluctant to place significant weight on §1692k(e) as a practical remedy for the concerns Carlisle has identified.

We are unpersuaded by what seems an implicit premise of Carlisle's arguments: that the bona fide error defense is a debt collector's sole recourse to avoid potential liability. We addressed a similar argument in *Heintz*, in which the petitioner urged that certain of the Act's substantive provisions would generate "'anomalies'" if the term "debt collector" was read to include litigating lawyers. 514 U. S., at 295. Among other things, the petitioner in *Heintz* contended that §1692c(c)'s bar on further communication with a consumer who notifies a debt collector that she is refusing to pay the debt would prohibit a lawyer from filing a lawsuit to collect the debt. *Id.,* at 296–297. We agreed it would be "odd" if the Act interfered in this way with "an ordinary debt-collecting lawsuit" but suggested §1692c(c) did not demand such a reading in light of several exceptions in the text of that provision itself. *Ibid.* As in *Heintz*, we need not authoritatively interpret the Act's conduct-regulating provisions to observe that those provisions should not be assumed to compel absurd results when applied to debt collecting attorneys.

To the extent the FDCPA imposes some constraints on a lawyer's advocacy on behalf of a client, it is hardly unique in our law. "[A]n attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct." *Nix* v. *Whiteside*, 475 U. S. 157, 168 (1986). Lawyers face sanctions, among other things, for suits presented "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. Rules Civ. Proc. 11(b), (c). Model rules of

professional conduct adopted by many States impose outer bounds on an attorney's pursuit of a client's interests. See, *e.g.,* ABA Model Rules of Professional Conduct 3.1 (2009) (requiring nonfrivolous basis in law and fact for claims asserted); 4.1 (truthfulness to third parties). In some circumstances, lawyers may face personal liability for conduct undertaken during representation of a client. See, *e.g., Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 191 (1994) ("Any person or entity, including a lawyer, . . . who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under [Securities and Exchange Commission Rule] 10b–5").

Moreover, a lawyer's interest in avoiding FDCPA liability may not always be adverse to her client. Some courts have held clients vicariously liable for their lawyers' violations of the FDCPA. See, *e.g., Fox* v. *Citicorp Credit Servs., Inc.*, 15 F. 3d 1507, 1516 (CA9 1994); see also *First Interstate Bank of Fort Collins, N. A.* v. *Soucie*, 924 P. 2d 1200, 1202 (Colo. App. 1996).

The suggestion that our reading of §1692k(c) will create unworkable consequences is also undermined by the existence of numerous state consumer protection and debt collection statutes that contain bona fide error defenses that are either silent as to, or expressly exclude, legal errors.[17] Several States have enacted debt collection statutes that contain neither an exemption for attorney debt collectors nor any bona fide error defense at all. See, *e.g.,* Mass. Gen. Laws, ch. 93, §49 (West 2008); Md. Com. Law Code Ann. §14–203 (Lexis 2005); Ore. Rev. Stat.

---

[17] See Brief for Ohio Creditor's Attorneys Association et al. as *Amici Curiae* 4–6, and nn. 7–8 (identifying "134 state consumer protection and debt collection statutes," 42 of which expressly exclude legal errors from their defenses for bona fide errors).

§646.641 (2007); Wis. Stat. §427.105 (2007–2008). More generally, a group of 21 States as *amici* supporting Jerman inform us they are aware of "no [judicial] decisions interpreting a parallel state bona fide error provision [in a civil regulatory statute] to immunize a defendant's mistake of law," except in a minority of statutes that expressly provide to the contrary.[18] See Brief for State of New York et al. as *Amici Curiae* 11, and n. 6. Neither Carlisle and its *amici* nor the dissent demonstrate that lawyers have suffered drastic consequences under these state regimes.

In the dissent's view, these policy concerns are evidence that "Congress could not have intended" the reading we adopt today. *Post*, at 5. But the dissent's reading raises concerns of its own. The dissent focuses on the facts of this case, in which an attorney debt collector, in the dissent's view, "acted reasonably at every step" and committed a "technical violation" resulting in no "actual harm" to the debtor. *Post,* at 12, 6, 8. But the dissent's legal theory does not limit the defense to attorney debt collectors or "technical" violations.[19] Under that approach, it appears, nonlawyer debt collectors could obtain blanket immunity for mistaken interpretations of the FDCPA simply by seeking the advice of legal counsel. Moreover, many debt collectors are compensated with a percentage of money recovered, and so will have a financial incentive to press

—————

[18] See, *e.g.,* Kan. Stat. Ann. §16a–5–201(7) (2007) (provision of Kansas Consumer Credit Code providing a defense for a "bona fide error of law or fact"); Ind. Code §24–9–5–5 (West 2004) (defense for creditor's "bona fide error of law or fact" in Indiana Home Loan Practices Act).

[19] The dissent also downplays the predicate fact that respondents in this case brought a foreclosure lawsuit against Jerman for a debt she had already repaid. Neither the lower courts nor this Court have been asked to consider, and thus we express no view about, whether Carlisle could be subject to liability under the FDCPA for that uncontested error—regardless of how reasonably Carlisle may have acted after the mistake was pointed out by Jerman's (privately retained) lawyer.

the boundaries of the Act's prohibitions on collection techniques. It is far from obvious why immunizing debt collectors who adopt aggressive but mistaken interpretations of the law would be consistent with the statute's broadly worded prohibitions on debt collector misconduct. Jerman and her *amici* express further concern that the dissent's reading would give a competitive advantage to debt collectors who press the boundaries of lawful conduct. They foresee a "race to the bottom" driving ethical collectors out of business. Brief for Petitioner 32; Brief for Public Citizen et al. as *Amici Curiae* 16–18. It is difficult to square such a result with Congress' express purpose "to eliminate abusive debt collection practices by debt collectors, [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged," §1692(e).

The dissent's reading also invites litigation about a debt collector's subjective intent to violate the FDCPA and the adequacy of procedures maintained to avoid legal error. Cf. *Barlow*, 7 Pet., at 411 (maxim that ignorance of the law will not excuse civil or criminal liability "results from the extreme difficulty of ascertaining what is, bona fide, the interpretation of the party"). Courts that read §1692k(c) to permit a mistake-of-law defense have adopted varying formulations of what legal procedures are "reasonably adapted to avoid any [legal] error."[20] Among other uncertainties, the dissent does not explain whether it

———————
[20] Compare *Hartman* v. *Great Senaca Financial Corp.*, 569 F. 3d 606, 614–615 (CA6 2009) (suggesting that reasonable procedures might include "perform[ing] ongoing FDCPA training, procur[ing] the most recent case law, or hav[ing] an individual responsible for continuing compliance with the FDCPA"), with *Johnson* v. *Riddle*, 443 F. 3d 723, 730–731 (CA10 2006) (suggesting that researching case law and filing a test case might be sufficient, but remanding for a jury determination of whether the "limited [legal] analysis" undertaken was sufficient and whether the test case was in fact a "sham").

would read §1692k(c) to impose a heightened standard for the procedures attorney debt collectors must maintain, as compared to nonattorney debt collectors. The increased cost to prospective plaintiffs in time, fees, and uncertainty of outcome may chill private suits under the statutory right of action, undermining the FDCPA's calibrated scheme of statutory incentives to encourage self-enforcement. Cf. FTC, Collecting Consumer Debts: The Challenge of Change 67 (2009) ("Because the Commission receives more than 70,000 third-party debt collection complaints per year, it is not feasible for federal govern-ment law enforcement to be the exclusive or primary means of deterring all possible law violations"). The state *amici* predict that, on the dissent's reading, consumers will have little incentive to bring enforcement actions "where the law [i]s at all unsettled, because in such cir-cumstances a debt collector could easily claim bona fide error of law"; in the States' view, the resulting "enforce-ment gap" would be "extensive" at both the federal and State levels. See Brief for State of New York et al. as *Amici Curiae* 7–10. In short, the policy concerns identified by the dissent tell only half the story.[21]

In sum, we do not foresee that our decision today will place unmanageable burdens on lawyers practicing in the debt collection industry. To the extent debt collecting lawyers face liability for mistaken interpretations of the requirements of the FDCPA, Carlisle, its *amici*, and the dissent have not shown that "the result [will be] so absurd as to warrant" disregarding the weight of textual author-

---

[21] The dissent adds in passing that today's decision "creates serious concerns . . . for First Amendment rights." *Post*, at 13 (citing *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 545 (2001)). That claim was neither raised nor passed upon below, and was mentioned neither in the certiorari papers nor the parties' merits briefing to this Court. We decline to express any view on it. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

ity discussed above. *Heintz*, 514 U. S., at 295. Absent such a showing, arguments that the Act strikes an undesirable balance in assigning the risks of legal misinterpretation are properly addressed to Congress. To the extent Congress is persuaded that the policy concerns identified by the dissent require a recalibration of the FDCPA's liability scheme, it is, of course, free to amend the statute accordingly.[22] Congress has wide latitude, for instance, to revise §1692k to excuse some or all mistakes of law or grant broader discretion to district courts to adjust a plaintiff's recovery. This Court may not, however, read more into §1692k(c) than the statutory language naturally supports. We therefore hold that the bona fide error defense in §1692k(c) does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute.

\* \* \*

For the reasons discussed above, the judgment of the United States Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[22] The FDCPA has been amended some eight times since its enactment in 1977; the most recent amendment addressed a concern not unrelated to the question we consider today, specifying that a pleading in a civil action is not an "initial communication" triggering obligations under §1692g requiring a written notice to the consumer. Financial Services Regulatory Relief Act of 2006, §802(a), 120 Stat. 2006 (codified at 15 U. S. C. §1692g(d)).

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–1200

———————

## KAREN L. JERMAN, PETITIONER *v.* CARLISLE, MC-NELLIE, RINI, KRAMER & ULRICH LPA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[April 21, 2010]

JUSTICE BREYER, concurring.

As respondents point out, the Court's interpretation of the Fair Debt Collection Practices Act may create a dilemma for lawyers who regularly engage in debt collection, including through litigation. See Brief for Respondents 44–48; *Heintz* v. *Jenkins*, 514 U. S. 291 (1995). Can those lawyers act in the best interests of their clients if they face personal liability when they rely on good-faith interpretations of the Act that are later rejected by a court? Or will that threat of personal liability lead them to do less than their best for those clients?

As the majority points out, however, the statute offers a way out of—though not a panacea for—this dilemma. *Ante*, at 13–14, 24–25. Faced with legal uncertainty, a lawyer can turn to the Federal Trade Commission (FTC or Commission) for an advisory opinion. 16 CFR §§1.1 to 1.4 (2009). And once he receives that opinion and acts upon it the dilemma disappears: If he fails to follow the opinion, he has not acted in good faith and can fairly be held liable. If he follows the opinion, the statute frees him from any such liability. 15 U. S. C. §1692k(e) (debt collectors immune from liability for "any act done or omitted in . . . conformity with any advisory opinion of the [Federal Trade] Commission"). See also R. Hobbs et al., National Consumer Law Center, Fair Debt Collection §§6.12.2, 7.3

(6th ed. 2008).

The FTC, of course, may refuse to issue such an opinion. See, *e.g.,* 16 CFR §1.1 (providing that the Commission will issue advisory opinions "where practicable" and only when "[t]he matter involves a substantial or novel question of fact or law and there is no clear Commission or court precedent" or "is of significant public interest"). Apparently, within the past decade, the FTC has received only seven requests and issued four opinions. See Tr. of Oral Arg. 27–28; see also Federal Trade Commission,Commission FDCPA Advisory Opinions, online at http://www.ftc.gov/os/statutes/fdcpajump.shtm (as visited Apr. 19, 2010, and available in Clerk of Court's case file). Yet, should the dilemma I have described above prove serious, I would expect the FTC to receive more requests and to respond to them, thereby reducing the scope of the problem to the point where other available tools, *e.g.*, damages caps and vicarious liability, will prove adequate. See *ante*, at 23–27. On this understanding, I agree with the Court and join its opinion.

# SUPREME COURT OF THE UNITED STATES

No. 08–1200

## KAREN L. JERMAN, PETITIONER *v.* CARLISLE, MC-NELLIE, RINI, KRAMER & ULRICH LPA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[April 21, 2010]

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join the Court's opinion except for its reliance upon two legal fictions. A portion of the Court's reasoning consists of this: The language in the Fair Debt Collection Practices Act (FDCPA or Act) tracks language in the Truth in Lending Act (TILA); and in the nine years between the enactment of TILA and the enactment of the FDCPA, three Courts of Appeals had "interpreted TILA's bona fide error defense as referring to clerical errors." *Ante*, at 14. Relying on our statement in *Bragdon* v. *Abbott*, 524 U. S. 624, 645 (1998), that Congress's repetition, in a new statute, of statutory language with a "'settled'" judicial interpretation indicates "'the intent to incorporate its . . . judicial interpretations as well,'" the Court concludes that these three Court of Appeals cases "suppor[t] an inference that Congress understood the statutory formula it chose for the FDCPA consistent with Federal Court of Appeals interpretations of TILA." *Ante*, at 14–16.

Let me assume (though I do not believe it) that what counts is what Congress "intended," even if that intent finds no expression in the enacted text. When a large majority of the Circuits, over a lengthy period of time, have uniformly reached a certain conclusion as to the meaning of a particular statutory text, it may be reason-

able to assume that Congress was aware of those holdings, took them to be correct, and intended the same meaning in adopting that text.[1]  It seems to me unreasonable, however, to assume that, when Congress has a bill before it that contains language used in an earlier statute, it is aware of, and approves as correct, a mere three Court of Appeals decisions interpreting that earlier statute over the previous nine years.  Can one really believe that a majority in both Houses of Congress knew of those three cases, and accepted them as correct (even when, as was the case here, some District Court opinions and a State Supreme Court opinion had concluded, to the contrary, that the defense covered legal errors, see *ante*, at 14–15, n. 10)?  This is a legal fiction, which has nothing to be said for it except that it can sometimes make our job easier. The Court acknowledges that "the interpretations of three Federal Courts of Appeals may not have 'settled' the meaning of TILA's bona fide error defense," but says "there is no reason to suppose that Congress disagreed with those interpretations." *Ante*, at 15–16.  Perhaps not; but no reason to suppose that it knew of and agreed with them either—which is presumably the proposition for which the Court cites them.

Even assuming, moreover, that Congress knew and approved of those cases, they would not support the Court's conclusion today.  All three of them said that TILA's bona fide error defense covered only *clerical* errors. See *Ives* v. *W. T. Grant Co.*, 522 F. 2d 749, 758 (CA2 1975) ("only available for clerical errors"); *Haynes* v. *Logan*

_____

[1] Of course where so many federal courts have read the language that way, the text was probably clear enough that resort to unexpressed congressional intent would be unnecessary.  Or indeed it could be said that such uniform and longstanding judicial interpretation had established the public meaning of the text, whether the Members of Congress were aware of the cases or not.  That would be the understanding of the text by reasonable people familiar with its legal context.

*Furniture Mart, Inc.*, 503 F. 2d 1161, 1167 (CA7 1974) ("basically only clerical errors"); *Palmer* v. *Wilson*, 502 F. 2d 860, 861 (CA9 1974) ("[C]lerical errors . . . are the only violations this section was designed to excuse"). Yet the Court specifically interprets the identical language in the FDCPA as providing a defense not only for clerical errors, but also for *factual* errors. See *ante*, at 19, 24; see also *ante*, at 20–21 (suggesting the same). If the Court really finds the three Courts of Appeals' interpretations of TILA indicative of congressional intent in the FDCPA, it should restrict its decision accordingly. As for me, I support the Court's inclusion of factual errors, because there is nothing in the text of the FDCPA limiting the excusable "not intentional" violations to those based on clerical errors, and since there is a long tradition in the common law and in our construction of federal statutes distinguishing errors of fact from errors of law.

The Court's opinion also makes fulsome use of that other legal fiction, legislative history, ranging from a single Representative's floor remarks on the House bill that became the FDCPA, *ante*, at 16, n. 11, to a single Representative's remarks in a Senate Subcommittee hearing on the House bill and three Senate bills, *ibid.*, to two 1979 Senate Committee Reports dealing not with the FDCPA but with the 1980 amendments to TILA, *ante*, at 17, n. 12, to remarks in a Committee markup of the Senate bill on the FDCPA, *ante*, at 21–22, n. 14, to a House Report dealing with an earlier version of the FDCPA, *ibid.* Is the conscientious attorney really expected to dig out such mini-nuggets of "congressional intent" from floor remarks, committee hearings, committee markups, and committee reports covering many different bills over many years? When the Court addresses such far-afield legislative history merely "for the sake of completeness," *ante*, at 20, it encourages and indeed prescribes such wasteful over-lawyering.

As it happens, moreover, one of the supposedly most "authoritative" snippets of legislative history, a Senate Committee Report dealing with the meaning of TILA, states very clearly that the 1980 amendment to TILA's bona fide error defense "clarified" the defense "to make clear that it applies to mechanical and computer errors," S. Rep. No. 96–73, pp. 7–8 (1979). Likewise, the 1999 American Law Report the Court cites, *ante*, at 17, n. 12, which relies on another Senate Committee Report, describes the amendment as clarifying the "prevailing view" that the defense "applies to clerical errors," Lockhart, 153 A. L. R. Fed. 211–212, §2[a] (1999).[2] Once again, the legal fiction contradicts the Court's conclusion that the language in the FDCPA, identical to the original TILA defense, applies to mistakes of fact.

But if legislative history is to be used, it should be used impartially. (Legislative history, after all, almost always has something for everyone!) The Court dismisses with a wave of the hand what seems to me the most persuasive legislative history (if legislative history could ever be persuasive) in the case. The respondents point to the Senate Committee Report on the FDCPA, which says that "[a] debt collector has no liability . . . if he violates the act in any manner, *including with regard to the act's coverage*, when such violation is unintentional and occurred despite procedures designed to avoid such violations." S. Rep. No. 95–382, p. 5 (1977) (emphasis added). The Court claims that a mistake about "the act's coverage" in this passage might refer to factual mistakes, such as a debt collector's mistaken belief "that a particular debt arose out of a nonconsumer transaction and was therefore not 'covered'

—————

[2] The page cited in the Senate Committee Report does not actually support the American Law Report's statement. It makes no mention of clarification or judicial interpretations; it merely states that the amendment is intended to "provide protection where errors are clerical or mechanical in nature," S. Rep. No. 96–368, p. 32 (1979).

by the Act," *ante*, at 21. The Court's explanation seems to me inadequate. No lawyer—indeed, no one speaking accurately—would equate a mistake regarding the Act's coverage with a mistake regarding whether a particular fact situation falls within the Act's coverage. What the Act covers ("the act's coverage") is one thing; whether a particular case falls *within* the Act's coverage is something else.

Even if (contrary to my perception) the phrase *could* be used to refer to *both* these things, by what principle does the Court reject the more plausible meaning? The fact that "attorneys were excluded from the Act's definition of 'debt collector' until 1986," *ibid.*, does not, as the Court contends, support its conclusion that errors of law are not covered. Attorneys are not the only ones who would have been able to claim a legal-error defense; non-attorneys make legal mistakes too. They also sometimes receive and rely upon erroneous legal advice from attorneys. Indeed, if anyone could satisfy the defense's requirement of maintaining "procedures reasonably adapted to avoid" a legal error, it would be a non-attorney debt collector who follows the procedure of directing all legal questions to his attorney.

The Court also points to "equivocal" evidence from the Senate Committee's final markup session, *ante*, at 21–22, n. 14, but it minimizes a decidedly unhelpful discussion of the scope of the defense during the session. In response to concern that the defense would be construed, like the TILA defense, as "only protecting against a mathematical error," a staff member explained that, because of differences in the nature of the statutes, the FDCPA defense was broader than the TILA defense and "would apply to *any* violation of the act which was unintentional." See Senate Committee on Banking, Housing and Urban Affairs, Markup Session: S. 1130—Debt Collection Legislation 20–21 (July 26, 1977) (emphasis added). The Chair-

man then asked: "So it's not simply a mathematical error
but *any* bona fide error without intent?" *Id.*, at 21 (em-
phasis added). To which the staff member responded:
"That's correct." *Ibid.* The repeated use of "any"—"any
violation" and "any bona fide error"—supports the natural
reading of the Committee Report's statement regarding
"the act's coverage" as including legal errors about the
scope of the Act, rather than just factual errors.

The Court ultimately dismisses the Senate Committee
Report on the ground that "the legislative record taken as
a whole does not lend strong support to Carlisle's view."
*Ante*, at 21. I think it more reasonable to give zero weight
to the other snippets of legislative history that the Court
relies upon, for the reason that the Senate Committee
Report on the very bill that became the FDCPA flatly
contradicts them. It is almost invariably the case that our
opinions benefit not at all from the make-weight use of
legislative history. But today's opinion probably suffers
from it. Better to spare us the results of legislative-history
research, however painfully and exhaustively conducted it
might have been.

The Court's textual analysis stands on its own, without
need of (or indeed any assistance from) the two fictions I
have discussed. Accordingly, I concur in the judgment of
the Court.

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–1200

———————

## KAREN L. JERMAN, PETITIONER *v.* CARLISLE, MC-NELLIE, RINI, KRAMER & ULRICH LPA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[April 21, 2010]

JUSTICE KENNEDY, with whom JUSTICE ALITO joins, dissenting.

The statute under consideration is the Fair Debt Collection Practices Act (FDCPA), 15 U. S. C. §1692 *et seq*. The statute excepts from liability a debt collector's "bona fide error[s]," provided that they were "not intentional" and reasonable procedures have been maintained to avoid them. §1692k(c). The Court today interprets this exception to exclude legal errors. In doing so, it adopts a questionable interpretation and rejects a straightforward, quite reasonable interpretation of the statute's plain terms. Its decision aligns the judicial system with those who would use litigation to enrich themselves at the expense of attorneys who strictly follow and adhere to professional and ethical standards.

When the law is used to punish good-faith mistakes; when adopting reasonable safeguards is not enough to avoid liability; when the costs of discovery and litigation are used to force settlement even absent fault or injury; when class-action suits transform technical legal violations into windfalls for plaintiffs or their attorneys, the Court, by failing to adopt a reasonable interpretation to counter these excesses, risks compromising its own institutional responsibility to ensure a workable and just litigation system. The interpretation of the FDCPA the

Court today endorses will entrench, not eliminate, some of the most troubling aspects of our legal system. Convinced that Congress did not intend this result, I submit this respectful dissent.

## I

### A

The FDCPA addresses "abusive debt collection practices," §1692(e), by regulating interactions between commercial debt collectors and consumers. See *ante*, at 1–2. The statute permits private suits against debt collectors who violate its provisions. §1692k(a). An exception to liability is provided by the so-called bona fide error defense:

> "A debt collector may not be held liable in any action . . . if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." §1692k(c).

This language does not exclude mistakes of law and is most naturally read to include them. Certainly a mistaken belief about the law is, if held in good faith, a "bona fide error" as that phrase is normally understood. See Black's Law Dictionary 582 (8th ed. 2004) (defining "error" as "a belief that what is false is true or that what is true is false," def. 1); *ibid.* ("[a] mistake of law or of fact in a tribunal's judgment, opinion, or order," def. 2); *ibid.* (listing categories of legal errors).

The choice of words provides further reinforcement for this view. The bona fide error exception in §1692k(c) applies if "the violation was not intentional and resulted from a bona fide error." The term "violation" specifically denotes a legal infraction. See *id.,* at 1600 ("An infraction or breach of the law; a transgression," def. 1). The statu-

tory term "violation" thus stands in direct contrast to other provisions of the FDCPA that describe conduct itself. This applies both to specific terms, *e.g.,* §1692e ("A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt"), and to more general ones, *e.g.,* §1692k(e) (referring to "any act done or omitted in good faith"). By linking the *mens rea* requirement ("not intentional") with the word "violation"—rather than with the conduct giving rise to the violation—the Act by its terms indicates that the bona fide error exception applies to legal errors as well as to factual ones.

The Court's precedents accord with this interpretation. Federal statutes that link the term "violation" with a *mens rea* requirement have been interpreted to excuse good-faith legal mistakes. See, *e.g., McLaughlin* v. *Richland Shoe Co.*, 486 U. S. 128, 129, 133 (1988) (the phrase "arising out of a willful violation" in the Fair Labor Standards Act applies where an employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute"); *Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 125, 126 (1985) (damages provision under the Age Discrimination in Employment Act, which applies "only in cases of willful violations," creates liability where an employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA" (internal quotation marks omitted)); cf. *Liparota* v. *United States*, 471 U. S. 419, 428 (1985) (prohibition on use of food stamps "'knowing [them] to have been received . . . in violation of'" federal law "undeniably requires a knowledge of illegality" (emphasis deleted)). The FDCPA's use of "violation" thus distinguishes it from most of the authorities relied upon by the Court to demonstrate that mistake-of-law defenses are disfavored. See, *e.g., ante*, at 7–8 (citing *Kolstad* v. *American Dental Assn.*, 527 U. S. 526 (1999)).

The Court's response is that there is something distinctive about the word "willful" that suggests an excuse for mistakes of law. This may well be true for criminal statutes, in which the terms "'knowing,' 'intentional' [and] 'willful'" have been distinguished in this regard. *Ante*, at 10 (citing *Safeco Ins. Co. of America* v. *Burr*, 551 U. S. 47, 57 (2007)). But this distinction is specific to the criminal context:

> "It is different in the criminal law. When the term 'willful' or 'willfully' has been used in a criminal statute, we have regularly read the modifier as limiting liability to knowing violations. This reading of the term, however, is tailored to the criminal law, where it is characteristically used to require a criminal intent beyond the purpose otherwise required for guilt, or an additional 'bad purpose,' or specific intent to violate a known legal duty created by highly technical statutes." *Id.,* at 57–58, n. 9 (citations omitted).

For this reason, the Court's citation to criminal cases, which are themselves inconsistent, see *Ratzlaf* v. *United States*, 510 U. S. 135 (1994), is unavailing. See *ante*, at 10–11, and n. 7.

In the civil context, by contrast, the word "willful" has been used to impose a *mens rea* threshold for liability that is lower, not higher, than an intentionality requirement. See *Safeco, supra*, at 57 ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well"). Avoiding liability under a statute aimed at intentional violations should therefore be easier, not harder, than avoiding liability under a statute aimed at willful violations. And certainly there is nothing in *Thurston* or *McLaughlin*—both civil cases—suggesting that they would have come out differently had the relevant statutes used "intentional violation" rather than

"willful violation."

## B

These considerations suffice to show that §1692k(c) is most reasonably read to include mistakes of law. Even if this were merely a permissible reading, however, it should be adopted to avoid the adverse consequences that must flow from the Court's contrary decision. The Court's reading leads to results Congress could not have intended.

### 1

The FDCPA is but one of many federal laws that Congress has enacted to protect consumers. A number of these statutes authorize the filing of private suits against those who use unfair or improper practices. See, *e.g.,* 15 U. S. C. §1692k (FDCPA); §1640 (Truth in Lending Act); §1681n (Fair Credit Reporting Act); 49 U. S. C. §32710 (Federal Odometer Disclosure Act); 11 U. S. C. §526(c)(2) (Bankruptcy Abuse Prevention and Consumer Protection Act of 2005). Several of these provisions permit a successful plaintiff to recover—in addition to actual damages—statutory damages, attorney's fees and costs, and in some cases punitive damages. *E.g.,* 15 U. S. C. §1640(a)(2) (statutory damages); §1640(a)(3) (attorney's fees and costs); §1681n(a)(1)(B) (statutory and punitive damages); §1681n(a)(1)(B)(3) (costs and attorney's fees); 49 U. S. C. §32710(a) ("3 times the actual damages or $1,500, whichever is greater"); §32710(b) (costs and attorney's fees); 11 U. S. C. §526(c)(3)(A) (costs and attorney's fees). Some also explicitly permit class-action suits. *E.g.,* 15 U. S. C. §1640(a)(2)(B); §1692k(a)(2)(B).

A collateral effect of these statutes may be to create incentives to file lawsuits even where no actual harm has occurred. This happens when the plaintiff can recover statutory damages for the violation and his or her attorney will receive fees if the suit is successful, no matter how slight the injury. A favorable verdict after trial is not

necessarily the goal; often the plaintiff will be just as happy with a settlement, as will his or her attorney (who will receive fees regardless). The defendant, meanwhile, may conclude a quick settlement is preferable to the costs of discovery and a protracted trial. And if the suit attains class-action status, the financial stakes rise in magnitude. See, *e.g.,* §1640(a)(2)(B) (class-action recovery of up to "the lesser of $500,000 or 1 per centum of the net worth of the [defendant]"); §1692k(a)(2)(B) (same).

The present case offers an object lesson. Respondents filed a complaint in state court on behalf of a client that mistakenly believed Jerman owed money to it. Jerman's attorney then informed respondents that the debt had been paid in full. Respondents confirmed this fact with the client and withdrew the lawsuit.

This might have been the end of the story. But because respondents had informed Jerman that she was required to dispute the debt in writing, she filed a class-action complaint. It did not matter that Jerman had claimed no harm as a result of respondents' actions. Jerman sued for damages, attorney's fees, and costs—including class damages of "$500,000 or 1% of defendants' net worth whichever is less." Amended Complaint in No. 1:06–CV–01397 (ND Ohio), p. 4. In addition to merits-related discovery, Jerman sought information from respondents concerning the income and net worth of each partner in the firm. At some point, Jerman proposed to settle with respondents for $15,000 in damages and $7,500 in attorney's fees. Amended Joint App. in No. 07–3964 (CA6), pp. 256–262. The case illustrates how a technical violation of a complex federal statute can give rise to costly litigation with incentives to settle simply to avoid attorney's fees.

Today's holding gives new impetus to this already troubling dynamic of allowing certain actors in the system to spin even good-faith, technical violations of federal law into lucrative litigation, if not for themselves then for the

attorneys who conceive of the suit. See *Federal Home Loan Mortgage Corp.* v. *Lamar*, 503 F. 3d 504, 513 (CA6 2007) (referring to the "cottage industry" of litigation that has arisen out of the FDCPA (internal quotation marks omitted)). It is clear that Congress, too, was troubled by this dynamic. That is precisely why it enacted a bona fide error defense. The Court's ruling, however, endorses and drives forward this dynamic, for today's holding leaves attorneys and their clients vulnerable to civil liability for adopting good-faith legal positions later determined to be mistaken, even if reasonable efforts were made to avoid mistakes.

The Court seeks to brush aside these concerns by noting that trivial violations will give rise to little in the way of actual damages and that trial courts "have discretion in calculating reasonable attorney's fees under [the] statute." *Ante*, at 23. It is not clear, however, that a court is permitted to adjust a fee award based on its assessment of the suit's utility. Cf. *Perdue* v. *Kenny A.*, *post*, at 9 (noting a "'strong presumption'" of reasonableness that attaches to a lodestar calculation of attorney's fees). Though the Court, properly, does not address the question here, it acknowledges that some courts have deemed fee awards to victorious plaintiffs to be "'mandatory,'" even if the plaintiff suffered no damage. *Ante*, at 23–24, n. 16.

The Court's second response is that the FDCPA guards against abusive suits and that suits brought "'in bad faith and for the purpose of harassment'" can lead to a fee award for the defendant. *Ante,* at 24 (quoting §1692k(a)(3)). Yet these safeguards cannot deter suits based on technical—but harmless—violations of the statute. If the plaintiff obtains a favorable judgment or a settlement, then by definition the suit will not have been brought in bad faith. See *Emanuel* v. *American Credit Exch.*, 870 F. 2d 805, 809 (CA2 1989) (FDCPA defendant's "claim for malicious prosecution cannot succeed unless the

action subject of the claim is unsuccessful").

Again the present case is instructive. Jerman brought suit without pointing to any actual harm that resulted from respondents' actions. At the time her complaint was filed, it was an open question in the Sixth Circuit whether a debt collector could demand that a debt be disputed in writing, and the district courts in the Circuit had reached different answers. *Ante,* at 4, n. 2. The trial court in this case happened to side with Jerman on the issue, 464 F. Supp. 2d 720, 722–725 (ND Ohio 2006), but it seems unlikely that the court would have labeled her suit "abusive" or "in bad faith" even if it had gone the other way.

There is no good basis for optimism, then, when one contemplates the practical consequences of today's decision. Given the complexity of the FDCPA regime, see 16 CFR pt. 901 (2009) (FDCPA regulations), technical violations are likely to be common. Indeed, the Court acknowledges that they are inevitable. See *ante*, at 12. As long as legal mistakes occur, plaintiffs and their attorneys will have an incentive to bring suits for these infractions. It seems unlikely that Congress sought to create a system that encourages costly and time-consuming litigation over harmless violations committed in good faith despite reasonable safeguards.

When construing a federal statute, courts should be mindful of the effect of the interpretation on congressional purposes explicit in the statutory text. The FDCPA states an objective that today's decision frustrates. The statutory purpose was to "eliminate abusive debt collection practices" and to ensure that debt collectors who refrain from using those practices "are not competitively disadvantaged." 15 U. S. C. §1692(e) ("Purposes"). The practices Congress addressed involved misconduct that is deliberate, see §1692(a) ("abusive, deceptive, and unfair debt collection practices"); §1692(c) ("misrepresentation or other abusive debt collection practices"), or unreasonable,

see §1692c(a)(1) (prohibiting debt collectors from communicating with debtors at times "which should be known" to be inconvenient); §1692e(8) (prohibiting the communication of credit card information "which should be known to be false"). That explains the statutory objective not to disadvantage debt collectors who "refrain" from abusive practices—that is to say, debt collectors who do not intentionally or unreasonably adopt them. It further explains why Congress included a good-faith error exception, which exempts violations that are not intentional or unreasonable.

In referring to "abusive debt collection practices," however, surely Congress did not contemplate attorneys who act based on reasonable, albeit ultimately mistaken, legal interpretations. A debt collector does not gain a competitive advantage by making good-faith legal errors any more than by making good-faith factual errors. This is expressly so if the debt collector has implemented "procedures reasonably adapted to avoid" them. By reading §1692k(c) to exclude good-faith mistakes of law, the Court fails to align its interpretation with the statutory objectives.

The Court urges, nevertheless, that there are policy concerns on the other side. The Court frets about debt collectors who "press the boundaries of the Act's prohibitions" and about a potential "'race to the bottom.'" *Ante*, at 27–28 (quoting Brief for Petitioner 32). For instance, in its view, interpreting §1692k(c) to encompass legal mistakes might mean that "nonlawyer debt collectors could obtain blanket immunity for mistaken interpretations of the FDCPA simply by seeking the advice of legal counsel." *Ante*, at 27. It must be remembered, however, that §1692k(c) may only be invoked where the debt collector's error is "bona fide" and where "reasonable procedures" have been adopted to avoid errors. There is no valid or persuasive reason to assume that Congress would want to

impose liability on a debt collector who relies in good faith on the reasonable advice of counsel. If anything, we should expect Congress to think that such behavior should be encouraged, not discouraged.

The Court also suggests that reading §1692k(c) to include legal errors would encourage litigation over a number of issues: what subjective intent is necessary for liability; what procedures are necessary to avoid legal mistakes; what standard applies to procedures adopted by attorney debt collectors as compared to non-attorney debt collectors. Yet these questions are no different from ones already raised by the statute. Whether the debt collector is an attorney or not, his or her subjective intent must be assessed before liability can be determined. Procedures to avoid mistakes—whether legal or otherwise—must be "reasonable," which is always a context-specific inquiry. The Court provides no reason to think that legal errors raise concerns that differ in these respects from those raised by non-legal errors.

2

There is a further and most serious reason to interpret §1692k(c) to include good-faith legal mistakes. In *Heintz* v. *Jenkins*, 514 U. S. 291 (1995), the Court held that attorneys engaged in debt-collection litigation may be "debt collectors" for purposes of the FDCPA. In reaching this conclusion the Court confronted the allegation that its interpretation would produce the anomalous result that attorneys could be liable for bringing legal claims against debtors if those claims ultimately proved unsuccessful. *Id.,* at 295. The Court rejected this argument. In doing so it said that §1692k(c) provides debt collectors with a defense for their bona fide errors. *Id.,* at 295.

Today the Court relies on *Heintz* to allay concerns about the practical implications of its decision. *Ante*, at 25. Yet the Court reads §1692k(c) to exclude mistakes of law,

thereby producing the very result that *Heintz* said would not come about. Attorneys may now be held liable for taking reasonable legal positions in good faith if those positions are ultimately rejected.

Attorneys are duty-bound to represent their clients with diligence, creativity, and painstaking care, all within the confines of the law. When statutory provisions have not yet been interpreted in a definitive way, principled advocacy is to be prized, not punished. Surely this includes offering interpretations of a statute that are permissible, even if not yet settled. The FDCPA is a complex statute, and its provisions are subject to different interpretations. See, *e.g., ante*, at 5, n. 4 (identifying splits of authority on two different FDCPA issues); Brief for National Association of Retail Collection Attorneys as *Amicus Curiae* 5–6 (identifying another split); see also *ante*, at 12. Attorneys will often find themselves confronted with a statutory provision that is susceptible to different but still reasonable interpretations.

An attorney's obligation in the face of uncertainty is to give the client his or her best professional assessment of the law's mandate. Under the Court's interpretation of the FDCPA, however, even that might leave the attorney vulnerable to suit. For if the attorney proceeds based on an interpretation later rejected by the courts, today's decision deems that to be actionable as an intentional "violation," with personal financial liability soon to follow. Indeed, even where a particular practice is compelled by existing precedent, the attorney may be sued if that precedent is later overturned.

These adverse consequences are evident in the instant case. When respondents filed a foreclosure complaint against Jerman on behalf of their client, they had no reason to doubt that the debt was valid. They had every reason, furthermore, to believe that they were on solid legal ground in asking her to dispute the amount owed in

writing. See, *e.g., Graziano* v. *Harrison*, 950 F. 2d 107, 112 (CA3 1991) (written objection is necessary for coherent statutory scheme and protects the debtor by "creat[ing] a lasting record of the fact that the debt has been disputed"). When Jerman disputed the debt, respondents verified that the debt had been satisfied and withdrew the lawsuit. Respondents acted reasonably at every step, and yet may still find themselves liable for a harmless violation.

After today's ruling, attorneys can be punished for advocacy reasonably deemed to be in compliance with the law or even required by it. This distorts the legal process. Henceforth, creditors' attorneys of the highest ethical standing are encouraged to adopt a debtor-friendly inter-pretation of every question, lest the attorneys themselves incur personal financial risk. It is most disturbing that this Court now adopts a statutory interpretation that will interject an attorney's personal financial interests into the professional and ethical dynamics of the attorney-client relationship. These consequences demonstrate how un-tenable the Court's statutory interpretation is and counsel in favor of a different reading. See *Milavetz, Gallop & Milavetz, P. A.* v. *United States*, 559 U. S. ___, ___, n. 5 (2010) (slip op., at 16, n. 5) (rejecting a reading of federal law that "would seriously undermine the attorney-client relationship").

The Court's response is that this possibility is nothing new, because attorneys are already duty-bound to comply with the law and with standards of professional conduct. Attorneys face sanctions for harassing behavior and frivo-lous litigation, and in some cases misconduct may give rise to personal liability. *Ante,* at 25–26.

This response only underscores the problem with the Court's approach. By reading §1692k(c) to exclude mis-takes of law, the Court ensures that attorneys will face liability even when they have done nothing wrong—indeed, even when they have acted in accordance with

their professional responsibilities. Here respondents' law firm did not harass Jerman; it did not file a frivolous suit against her; it did not intentionally mislead her; it caused her no damages or injury. The firm acted upon a reasonable legal interpretation that the District Court later thought to be mistaken. The District Court's position, as all concede, was in conflict with other published, reasoned opinions. *Ante,* at 4, n. 2. (And in the instant case, neither the Court of Appeals nor this Court has decided the issue. See *ante,* at 5, n. 3.) If the law firm can be punished for making a good-faith legal error, then to be safe an attorney must always stick to the most debtor-friendly interpretation of the statute, lest automatic liability follow if some later decision adopts a different rule. This dynamic creates serious concerns, not only for the attorney-client relationship but also for First Amendment rights. Cf. *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 545 (2001) (law restricting arguments available to attorneys "prohibits speech and expression upon which courts must depend for the proper exercise of the judicial power"). We need not decide that these concerns rise to the level of an independent constitutional violation, see *ante*, at 29, n. 21, to recognize that they counsel against a problematic interpretation of the statute. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress").

JUSTICE BREYER—although not the Court—argues that an attorney faced with legal uncertainty only needs to turn to the Federal Trade Commission (FTC) for an advisory opinion. An attorney's actions in conformity with the opinion will be shielded from liability. *Ante*, at 1 (concurring opinion) (citing 15 U. S. C. §1692k(e)). This argument

misconceives the practical realities of litigation. Filings and motions are made under pressing time constraints; arguments must be offered quickly in reply; and strategic decisions must be taken in the face of incomplete information. Lawyers in practice would not consider this alternative at all realistic, particularly where the defense is needed most.

And even were there time to generate a formal request to the FTC and wait an average of three or four months for a response (assuming the FTC responds at all), the argument assumes that an ambiguity in the statute is obvious, not latent, that the problem is at once apparent, and that a conscious decision to invoke FTC procedures can be made. But the problem in many instances is that interpretive alternatives are not at once apparent. All this may explain why, in the past decade, the FTC has issued only four opinions in response to just seven requests. See Tr. of Oral Arg. 27–28, 30. The FTC advisory process does not remedy the difficulties that the Court's opinion will cause.

Even if an FTC opinion is obtained, moreover, the ethical dilemma of counsel is not resolved. If the FTC adopts a position unfavorable to the client, the attorney may still believe the FTC is mistaken. Yet under today's decision, the attorney who in good faith continues to assert a reasonable position to the contrary does so at risk of personal liability. This alters the ethical balance central to the adversary system; and it is, again, a reason for the Court to adopt a different, but still reasonable, interpretation to avoid systemic disruption.

## II

The Court does not assert that its interpretation is clearly commanded by the text. Instead, its decision relies on an amalgam of arguments that, taken together, are said to establish the superiority of its preferred reading. This does not withstand scrutiny.

First, the Court relies on the maxim that "'ignorance of the law will not excuse any person, either civilly or criminally.'" *Ante*, at 6 (quoting *Barlow* v. *United States*, 7 Pet. 404, 411 (1833)). There is no doubt that this principle "is deeply rooted in the American legal system." *Cheek* v. *United States*, 498 U. S. 192, 199 (1991). Yet it is unhelpful to the Court's position. The maxim the Court cites is based on the premise "that the law is definite and knowable," so that all must be deemed to know its mandate. *Ibid.* See also O. Holmes, The Common Law 48 (1881) ("[T]o admit the excuse [of ignorance] at all would be to encourage ignorance where the law-maker has determined to make men know and obey"). In other words, citizens cannot avoid compliance with the law simply by demonstrating a failure to learn it.

The most straightforward application of this principle is to statutory provisions that delineate a category of prohibited conduct. These statutes will not be read to excuse legal mistakes absent some indication that the legislature meant to do so. See, *e.g., Armour Packing Co.* v. *United States*, 209 U. S. 56, 70, 85–86 (1908) (rejecting the defendant's attempt to read a mistake-of-law defense into a criminal statute forbidding shippers to "obtain or dispose of property at less than the regular rate established"); *ante*, at 7–8 (discussing a federal statute imposing liability for "intentional discrimination").

In the present case, however, the Court is not asked whether a mistake of law should excuse respondents from a general prohibition that would otherwise cover their conduct. Rather, the issue is the scope of an express exception to a general prohibition. There is good reason to think the distinction matters. It is one thing to presume that Congress does not intend to create an exception to a general rule through silence; it is quite another to presume that an explicit statutory exception should be confined despite the existence of other sensible interpreta-

tions. Cf. *Kosak* v. *United States*, 465 U. S. 848, 853, n. 9 (1984) (although the Federal Tort Claims Act waives sovereign immunity, "the proper objective of a court attempting to construe [an exception to the Act] is to identify those circumstances which are within the words and reason of the exception—no less and no more" (internal quotation marks omitted)). This is all the more true where the other possible interpretations are more consistent with the purposes of the regulatory scheme. By its terms, §1692k(c) encompasses—without limitation—all violations that are "not intentional and resul[t] from a bona fide error." The Court provides no reason to read this language narrowly.

The Court responds that "our precedents have made clear for more than 175 years" that the presumption against mistake-of-law defenses applies even to explicit statutory exceptions. *Ante*, 6–7, n. 5. By this the Court means that one case applied the presumption to an exception more than 175 years ago. In *Barlow*, the Court declined to excuse an alleged mistake of law despite a statutory provision that excepted "false denomination[s] . . . [that] happened by mistake or accident, and not from any intention to defraud the revenue." 7 Pet., at 406. In construing this language, the *Barlow* Court noted that it demonstrated congressional intent to exclude mistakes of law:

> "The very association of mistake and accident, in this [connection], furnishes a strong ground to presume that the legislature had the same classes of cases in view . . . . Mistakes in the construction of the law, seem as little intended to be excepted by the proviso, as accidents in the construction of the law." *Id.,* at 411–412.

Unlike the provision at issue in *Barlow*, §1692k(c) gives no indication that its broad reference to "bona fide error[s]"

was meant to exclude legal mistakes.

Even if statutory exceptions should normally be construed to exclude mistakes of law, moreover, that guideline would only apply absent intent to depart from the general rule. There is no doubt that Congress may create a mistake-of-law defense; the question is whether it has done so here. See *Ratzlaf*, 510 U. S, at 149. As explained above, see Part I–A, *supra*, Congress has made its choice plain by using the word "violation" in §1692k(c) to indicate that mistakes of law are to be included.

Second, the Court attempts to draw a contrast between §1692k(c) and the administrative penalties in the Federal Trade Commission Act (FTC Act), 38 Stat. 717, 15 U. S. C. §41 *et seq*. Under the FTC Act, a debt collector may face civil penalties of up to $16,000 per day for acting with "actual knowledge or knowledge fairly implied on the basis of objective circumstances that [an] act is" prohibited under the FDCPA. §§45(m)(1)(A), (C); 74 Fed. Reg. 858 (2009) (amending 16 CFR §1.98(d) (2009)). The Court reasons that the FTC provision is meant to provide relatively harsh penalties for intentional violations. By contrast, the argument continues, the penalties in the FDCPA itself must cover—and hence §1692k(c) must not excuse—unintentional violations. *Ante*, at 8–9.

The argument rests on a mistaken premise—namely, that §1692k(c) must immunize all legal errors or none. This misreads the statute. As the text states, it applies only to "bona fide" errors committed despite "the maintenance of procedures reasonably adapted to avoid" these mistakes. So under a sensible reading of the statute, (1) intentional violations are punishable under the heightened penalties of the FTC Act; (2) unintentional violations are generally subject to punishment under the FDCPA; and (3) a defendant may escape liability altogether by proving that a violation was based on a bona fide error and that reasonable error-prevention procedures were in

place.    There is nothing incongruous in this scheme.
Indeed, for the reasons described in Part I, *supra*, it is far
less peculiar than the Court's reading, which would sub-
ject attorneys to liability for good-faith legal advocacy,
even advocacy based on an accurate assessment of then-
existing case law.

Third, in construing §1692k(c) to exclude legal errors,
the Court points to the requirement that a debt collector
maintain "procedures reasonably adapted to avoid any
such error."  The Court asserts that this phrase most
naturally evokes procedures to avoid clerical or factual
mistakes.  There is nothing natural in reading this phrase
contrary to its plain terms, which do not distinguish be-
tween different categories of mistakes.  Nor is there any-
thing unusual about procedures adopted to avoid legal
mistakes.  The present case is again instructive.  Accord-
ing to the District Court, respondents designated a lead
FDCPA compliance attorney, who regularly attended
conferences and seminars; subscribed to relevant periodi-
cals; distributed leading FDCPA cases to all attorneys;
trained new attorneys on their statutory obligations; and
held regular firm-wide meetings on FDCPA issues.  See
538 F. 3d 469, 477 (CA6 2008).  These procedures are not
only "reasonably adapted to avoid [legal] error[s]," but also
accord with the FDCPA's purposes.

The Court argues, nonetheless, that the statute contem-
plates only clerical or factual errors, for these are the type
of errors that can mostly naturally be addressed through
"'a series of steps followed in a regular orderly definite
way.'"  *Ante*, at 12 (quoting Webster's Third New Interna-
tional Dictionary 1807 (1976)).  As made clear by the steps
that respondents have taken to ensure FDCPA compli-
ance, this is simply not true.  The Court also speculates
that procedures to avoid clerical or factual errors will be
easier to implement than procedures to avoid legal errors.
Even if this were not pure conjecture, it has nothing to do

with what the statute requires. The statute does not talk about procedures that eliminate all—or even most—errors. It merely requires procedures "reasonably adapted to avoid any such error." The statute adopts the sensible approach of requiring reasonable safeguards if liability is to be avoided. This approach, not the Court's interpretation, reflects the reality of debt-collection practices.

Fourth, the Court argues that construing §1692k(c) to encompass a mistake-of-law defense "is at odds with" the role contemplated for the FTC. *Ante*, at 13. This is so, it contends, because the FTC is authorized to issue advisory opinions, and the statute shields from liability "any act done or omitted in good faith in conformity" with such opinions. §1692k(e). But why, asks the Court, would a debt collector seek an opinion from the FTC if immunity under §1692k(c) could be obtained simply by relying in good faith on advice from private counsel? Going further, the Court suggests that debt collectors might "have an affirmative incentive not to seek an advisory opinion to resolve ambiguity in the law, which would then prevent them from claiming good-faith immunity for violations." *Ante*, at 13.

There is little substance to this line of reasoning. As the Court itself acknowledges, debt collectors would have an incentive to invoke the FTC safe harbor even if §1692k(c) is construed to include a mistake-of-law defense, because the safe harbor provides a "more categorical immunity." *Ante*, at 13, n. 8. Additionally, if a debt collector avoids seeking an advisory opinion from the FTC out of concern that the answer will be unfavorable, that seems quite at odds with saying that his or her ignorance is "bona fide."

It should be noted further that the Court's concern about encouraging ignorance could apply just as well to §45(m)(1)(A). That provision subjects a debt collector to harsh penalties for violating an FTC rule "with actual knowledge or knowledge fairly implied on the basis of

objective circumstances that such act is unfair or deceptive and is prohibited by such rule." No one contends that this will encourage debt collectors to avoid learning the FTC's rules. Yet there is no doubt that §45(m)(1)(A) permits a mistake-of-law defense.

All this assumes, of course, that obtaining an FTC advisory opinion will be a reasonably practical possibility. For the reasons stated above, see Part I–B–2, *supra*, this is to be doubted. Even the Court recognizes the limited role that the FTC has played. *Ante*, at 25 ("[E]vidence of present administrative practice makes us reluctant to place significant weight on §1692k(e) as a practical remedy").

Fifth, the Court asserts that "[a]ny remaining doubt" about its preferred interpretation is dispelled by the FDCPA's statutory history. The Court points to the fact that §1692k(c) mirrors a bona fide error defense provision in the earlier enacted Truth in Lending Act (TILA), arguing that Congress sought to incorporate into the FDCPA the view of the Courts of Appeals that the TILA defense applied only to clerical errors. *Ante*, at 14–15. As JUSTICE SCALIA points out, the Court's claims of judicial uniformity are overstated. See *ante*, at 2–3 (opinion concurring in part and concurring in judgment). They rest on three Court of Appeals decisions, which are contradicted by several District Court opinions and a State Supreme Court opinion—hardly a consistent legal backdrop against which to divine legislative intent. The Court also ignores the fact that those three Courts of Appeals had construed the TILA provision to apply only to clerical errors. See *Ives* v. *W. T. Grant Co.*, 522 F. 2d 749, 758 (CA2 1975); *Haynes* v. *Logan Furniture Mart, Inc.*, 503 F. 2d 1161, 1167 (CA7 1974); *Palmer* v. *Wilson*, 502 F. 2d 860, 861 (CA9 1974). The Court therefore cannot explain why it reads §1692k(c) more broadly to encompass factual mistakes as well.

It is of even greater significance that in 1980 Congress amended the TILA's bona fide error exception explicitly to

exclude "an error of legal judgment with respect to a person's obligations under [the TILA]." See Truth in Lending Simplification and Reform Act, §615 (c), 94 Stat. 181. This amendment would have been unnecessary if Congress had understood the pre-1980 language to exclude legal errors. The natural inference is that the pre-amendment TILA language—the same language later incorporated nearly verbatim into §1692k(c)—was understood to cover those errors.

The Court's responses to this point are perplexing. The Court first says that the 1980 amendment did not "obvious[ly]" change the scope of the TILA's bona fide error defense, given the "uniform interpretation" that the defense had been given in the Courts of Appeals. *Ante*, at 17. The Court thus prefers to make an entire statutory amendment surplusage rather than abandon its dubious assumption that Congress meant to ratify a nascent Court of Appeals consensus. Cf. *Corley* v. *United States*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 9) ("[O]ne of the most basic interpretive canons [is] that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (internal quotation marks omitted; second alteration in original)). (Without any evidence, the Court speculates that perhaps the amendment was intended to codify existing judicial interpretations that excluded legal errors. *Ante*, at 17–18. If those judicial interpretation were truly as uniform as the Court suggests—and the presumption against mistake-of-law defenses as ironclad—there would have been no need for such a recodification.)

The Court is hesitant as well to give the 1980 amendment weight because Congress "has not expressly *included* mistakes of law in any of the numerous bona fide error defenses, worded in pertinent part identically to §1692k(c), elsewhere in the U. S. Code." *Ante*, at 18 (emphasis in

original).    In other words, the Court refuses to read
§1692k(c) to cover mistakes of law because other bona fide
error statutes do not expressly refer to such mistakes.  But
the reverse should be true: If other bona fide error provi-
sions included mistake-of-law language but §1692k(c) did
not, we might think that the omission in §1692k(c) sig-
naled Congress's intent to exclude mistakes of law.  The
absence of mistake-of-law language in §1692k(c) is conse-
quently less noteworthy because other statutes also omit
such language.

The Court emphasizes that some bona fide error de-
fenses, like the one in the current version of the TILA,
expressly exclude legal errors from their scope.  *Ante*, at
18 (citing 12 U. S. C. §4010(c)(2)).  Yet this also can prove
the opposite of what the Court says it does: If a bona fide
error defense were generally assumed not to include legal
mistakes (as the Court argues), there would be no need to
expressly exclude them.  It is only if the defense would
otherwise include such errors that exclusionary language
becomes necessary.  By writing explicit exclusionary lan-
guage into the TILA (and some other federal provisions),
Congress has indicated that those provisions would other-
wise cover good-faith legal errors.

                    *    *    *

For these reasons, §1692k(c) is best read to encompass
mistakes of law.  I would affirm the judgment of the Court
of Appeals.